**DCA FOOD INDUSTRIES INC.,**
**Plaintiff,**

v.

**HAWTHORN MELLODY, INC., Hawthorn Mellody Farms Dairy of Wisconsin, Inc., and H. M. D. Corporation, Defendants.**

**No. 78 Civ. 2988 (CHT).**

United States District Court,
S. D. New York.

May 3, 1979.

576

Amster, Rothstein & Engelberg, New York City, for plaintiff; Morton Amster, Daniel Ebenstein, Roy H. Wepner, Jay Bondell, New York City, of counsel.

Battle, Fowler, Jaffin, Pierce & Kheel by Gerald J. Fields, New York City, for defendants; Brownstein, Zeidman & Schomer by Donald A. Kaul, Washington, D. C., of counsel.

## OPINION

TENNEY, District Judge.

In pursuit of the American dessert and snack food dollar, the plaintiff and the defendants have come to loggerheads over the use of the brand name YOZERT to identify their respective frozen yogurt products and ingredients. Plaintiff DCA Food Industries Inc. ("DCA") is a New York corporation that manufactures and sells, *inter alia,* a variety of dairy products and their ingredients. Defendants Hawthorn Mellody, Inc. ("Hawthorn Mellody"), H.M.D. Corporation ("HMD") and Hawthorn Mellody Farms Dairy of Wisconsin, Inc. ("Hawthorn Wisconsin") are related foreign corporations engaged in similar trade. Neither plaintiff nor defendants have federal registration for the name YOZERT.

The facts, derived from the Complaint, are as follows: in the spring of 1977, the plaintiff developed formulas for a line of frozen yogurt products and a program—including packaging and display—for the merchandising of these products to and through a market consisting of wholesalers, manufacturers and supermarket chains. Although the plaintiff initially thought to use its registered FUNZERT mark for the line, it chose YOZERT in early June 1977 after a registration search that revealed the availability of the term. In the middle of that month the plaintiff made its first shipment of YOZERT frozen whipped yogurt

products in interstate commerce in order to establish its right to federal registration: at the same time it moved ahead with its merchandising efforts for the line. On August 29, 1977, plaintiff filed to register the name YOZERT with the United States Patent and Trademark Office.

In late September 1977, Hawthorn Wisconsin began to use the YOZERT name for some business relating to the sale of its frozen yogurt products: the plaintiff claims that this use was with knowledge of the plaintiff's prior adoption of the mark. In the middle of October, Hawthorn Wisconsin filed for federal registration of the mark, and plaintiff alleges that one or more of the defendants continued to use the YOZERT name in connection with the actual sale of frozen yogurt products. In April 1978, some time after plaintiff's counsel had formally apprised the defendants of plaintiff's assertion of rights in the mark, defendant HMD received a New York State trademark registration for YOZERT.

Asserting first rights in the mark, the plaintiff has now brought this federal action charging violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits false designations of origin and false descriptions of goods in interstate commerce. The plaintiff also claims trademark infringement and unfair competition under New York law and alleges dilution of the YOZERT trademark within the meaning of section 368–d of the New York General Business Law. It has asked for cancellation of the New York State trademark and for damages as a result of the allegedly fraudulent registration. Jurisdiction to hear the federal claim is asserted under 28 U.S.C. § 1338(a); the state claims are suggested alternatively under 28 U.S.C. § 1338(b) (pendent to a claim arising under the federal trademark law) or in this court's diversity jurisdiction, 28 U.S.C. § 1332.

All three defendants have moved to dismiss the Lanham Act charge on grounds that it fails to state a claim on which relief can be granted, Rule 12(b)(6), Federal Rules of Civil Procedure ("Rules"), and to dismiss the state claims on a variety of theories including loss of pendent jurisdiction if the Lanham Act claim falls. HMD and Hawthorn Wisconsin have further moved to dismiss for lack of in personam jurisdiction and for improper venue. Rules 12(b)(2) and (3). Alternatively, all three defendants have moved to transfer the proceedings to the United States District Court for the Northern District of Illinois. 28 U.S.C. §§ 1404(a) and/or 1406(a). For the following reasons, the motions are denied in toto.

### The Federal Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), states in pertinent part:

Any person who shall . . . use in connection with any goods or services . . . a false designation of origin, or any false description or representation . . . and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity . . . cause or procure the same to be . . . used in commerce . . ., shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The defendants claim that no cause of action is stated against them under this language because the mark in question is unregistered and because their names and addresses appear on their YOZERT labels. On the latter fact they reason that there can be no "false designation of origin" within the meaning of the statute.

This Court does not adopt so narrow and technical a reading of section 43(a) and neither have the cases construing the statute since it was passed. The court of appeals for this circuit has stated that section 43(a) embodies the congressional will to "create a special and limited unfair competition remedy . . . to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 692 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). The ethos endorsed by the *Colligan*

court is found in language which, it said, succinctly stated the import of § 43(a):

"[Y]ou may not conduct your business in a way that unnecessarily or unfairly interferes with and injures another; you may not destroy the basis of genuine competition by destroying the buyer's opportunity to judge fairly between rival commodities by introducing such factors as false descriptive trademarks which are capable of misinforming as to the true qualities of the competitive products."

*Id.* at 692 n. 27, *quoting Gold Seal Co. v. Weeks,* 129 F.Supp. 928, 940 (D.D.C.1955), aff'd sub nom. *S. C. Johnson & Son, Inc. v. Gold Seal Co.,* 97 U.S.App.D.C. 282, 230 F.2d 832 (D.C. Cir. 1956) (per curiam).

In *Geisel v. Poynter Products Inc.,* 283 F.Supp. 261 (S.D.N.Y.1968), the court held that "[s]ection 43(a) provides relief against that kind of unfair competition which is analogous to the misappropriation or misuse of trade names or trademarks." *Id.* at 267. A right of action is provided against the

deceptive and misleading use of words, names, symbols, or devices, or any combination thereof, which have been adopted by a manufacturer or merchant to identify his goods and distinguish them from those manufactured by others.

*Id., quoting Federal-Mogul-Bower Bearings Inc. v. Azoff,* 313 F.2d 405, 409 (6th Cir. 1963).

Within this broad context it is difficult to see what could more fairly present a claim under section 43(a) than an alleged purloining and use interstate of a coined merchandise mark. The fact that the mark is not registered does not cut off a remedy under section 43(a). *Apollo Distributing Co. v. Apollo Imports Inc.,* 341 F.Supp. 455, 458 (S.D.N.Y.1972), and cases cited therein. Moreover, there is ample precedent to address by this statute a dispute concerning the primacy of a mark. In *Beech-Nut, Inc. v. Warner-Lambert Co.,* 480 F.2d 801, 803 (2d Cir. 1973), the claim involved two similarly named candy breath mints. Endorsing jurisdiction, the court remarked:

Despite considerable doubt created by the language of the statute as to whether . . . [i]t covers mere trademark infringement and unfair competition, the many cases decided since its enactment leave no doubt that, as construed by the courts, the claims advanced here may properly be brought under [section 43(a)].

*Id.* at 803.

And, while there does not seem to be so clear an example of racing to the registry door as we have here, an analogous situation was resolved under this statute in *Sutton Cosmetics (P. R.) v. Lander Co.,* 455 F.2d 285 (2d Cir. 1972). In that case the court endorsed the grant of a preliminary injunction under section 43(a) where the first user of an abandoned trademark exploited it for only five months prior to the junior user's adoption of the identical mark for identical goods. *See also Apollo Distributing Co. v. Apollo Imports Inc., supra* (section 43(a) invoked against junior user of unregistered mark where senior user had well established reputation using identical mark for similar goods); *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288 (S.D.N.Y.1972) (relief under this section where second comer with slightly different name found to have deliberately infringed plaintiff's good will in similar, but not identical, merchandising field); *Scarves by Vera, Inc. v. United Merchants and Manufacturers, Inc.,* 173 F.Supp. 625 (S.D.N.Y.1959) (good cause of action under section 43(a) to protect common law rights in merchandise mark infringed by use of same mark, differently spelled).

The defendants urge, however, that the prophylactic purposes of section 43(a) cannot be invoked where, as here, the manufacturer's or distributor's name appears on the product. They rely on *The American Rolex Watch Corp. v. Ricoh Time Corp.,* 491 F.2d 877 (2d Cir. 1974) ("Rolex"), a case of product design copy coupled with use of a somewhat similar trade symbol.[1]

---

1. The defendants also rely on *McTavish Bob Oil Co. v. Disco Oil Co.,* 345 F.Supp. 1379 (N.D.Ill. 1972). There the plaintiff alleged that it had used "Disco" as a trademark in an extensive

Under *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and its companion case *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), the *Rolex* court found that the act of copying the product did not provide a basis for a charge of unfair competition, and plaintiff's claim under section 43(a) was deemed "misplaced in view of the prominent display of [defendant's name] on the challenged watch." *Rolex, supra,* 491 F.2d at 879. Similarly, in *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304 (2d Cir. 1972), another case of design copy, the court endorsed a refusal of a preliminary injunction sought, in part, on the basis of a section 43(a) claim. In *Bose* the defendant had placed its name on the copied objects and their shipping cartons, a circumstance which led the court to remark that "there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed." *Id.* at 310.

The breadth of this comment has drawn criticism even in other product design cases, *e. g., Teledyne Industries, Inc. v. Windmere Products, Inc.,* 433 F.Supp. 710, 739 (S.D. Fla.1977).[2] Its validity, vel non, with regard to those cases is not now before the Court. However, if the *Bose* comment did any more than express in a rather over-

broad way the reluctance of the courts to protect under the trademark law a design deemed insufficiently meritorious for patent, it would still be a very different matter similarly to deny protection to the verbal symbol of the goodwill of a product. Such protection is the very essence of the law of trademarks. Even if the product may be copied so long as the source is identified, that does not mean that the front-line symbol of the source may be copied so long as a secondary source identification is also used. Surely one reason to adopt a trademark is to avoid asking the consumer to resort to footnotes in order to trigger the desired cognitive responses. Moreover, where the consumer is absorbing the entire product as a designed object, part of what he perceives is likely to be the name or symbol of the producer. By contrast, when he is looking only at a symbol that conveys in shorthand a whole set of perceptions about the product and its source, he is not likely to go an extra step to correct any source confusion. The name YOZERT, like any other trademark, is intended to carry an informational load that *includes* origin. It is therefore a false representation within the meaning of the statute to employ a merchandise mark that bespeaks an origin differing from the true source of the goods.[3]

interstate advertising and promotion campaign that included Illinois. However, the defendant had incorporated as "Disco" Oil Company in the state of Illinois prior to plaintiff's use of the name. On the facts before it the Illinois court refused to sustain the claim, stating that section 43(a) applies only if the "alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods come from the same source." *Id.* at 1381, quoting *Joshua Meier Co. v. Albany Novelty Mfg. Co.,* 236 F.2d 144 (2d Cir. 1956). This case is distinguishable from the one at bar because the defendant's incorporation in Illinois took place before the plaintiff's alleged first use of the trademark; because the plaintiff did not support its allegations that the trademark was used "extensively" interstate after defendant's incorporation or at all prior to defendant's incorporation; and because the plaintiff did not allege that it had a common law trademark anywhere. These facts and the court's question "whether § 43(a) applies to the

use by a defendant of a plaintiff's alleged common law trademark," *id.* at 1381, (answered affirmatively in this circuit) are very different from those at bar where the plaintiff does allege extensive interstate use of a common law trademark prior to the defendants' registration of that mark in New York, and where the plaintiff further alleges that New York registration was obtained with knowledge of the prior use.

2. Rejecting the *Bose* theory, the court noted that "[c]ircumstances could arise where the proper trade name was displayed so inconspicuously or was so similar to the trade name of the opponent's product that all but the most sharp-eyed consumers would buy the copy as the original."

3. Other arguments made by the defendants are similarly off the mark. For example, defendants argue that plaintiff's three-month marketing lead was not long enough for plaintiff to have acquired rights protectable under section 43(a), *i. e.,* to have acquired "secondary mean-

*State Law Claims*

The defendants urge that all the rest of plaintiff's claims be dismissed for failure of the federal claim or, alternatively, for failure to state a claim. The first theory is, of course, moot, and the substantive arguments for dismissal are desultory at best. Regarding Count II, the defendants allege that no unfair competition exists under New York law, *citing Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). In *Avon* the court endorsed dismissal of the unfair competition claim, remarking that the New York precedents cited by its plaintiff to support the claim were unpersuasive, because in all those cases "the second user had commenced his use with full knowledge of the first user's extended, widespread use and with no interest other than to appropriate and trade on the first user's good will." *Id.* at 614 n. 11.

▮▮▮ These defendants seize on that language to urge that they had no full knowledge of or interest in appropriating the plaintiff's mark, and that, in any event, the plaintiff could not have achieved a pro-

tected "widespread use" for the YOZERT mark in the slim lead time it enjoyed. The defendants argue analogously that the plaintiff cannot prevail on a common law trademark infringement claim absent a showing of "secondary meaning" for their YOZERT.

To begin with, these contentions are matters of proof and are wholly inappropriate in a motion to dismiss where all well pleaded facts are taken as true. Moreover, the *Avon* dictum is not a full expression of New York law on the matter of unfair competition or trademark infringement.

> Relief against unfair competition . . . is no longer limited in New York to situations where secondary meaning has been established so that a defendant can be charged with passing off his goods as those of another, but rather . . . relief has been granted in New York in a wide variety of situations to insure that "one may not misappropriate the results of the skill, expenditures and labors of a competitor."

*Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 781 (2d Cir. 1964), *cert. denied,*

---

ing." That term has been defined as "[t]he power of a name or other configuration to symbolize a particular business, product or company . . . ." *Ideal Toy Corp. v. Kenner Products Div. of General Mills Fun Group, Inc.,* 443 F.Supp. 291, 305 n. 14 (S.D.N.Y.1978). In support of this position the defendants cite *Joshua Meier Co., Inc. v. Albany Novelty Mfg. Co.,* 236 F.2d 144 (2d Cir. 1956). On the facts presented to it, the *Meier* court stated that section 43(a) protection would be extended

> only . . . if the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods come from the same source. [The statute] requires at least that the defendant be guilty of a false representation. If the expressions used here by the defendant are not uniquely associated with the plaintiff's goods there is no such false representation.

*Id.* at 147. However, as the plaintiff correctly points out, the *Meier* court went on to state that "[i]t may well be that if the plaintiff has acquired a common law trademark, the defendant's use of the mark constitutes a false designation of origin within the meaning of [the statute]." *Id.*

Whether and to what extent a mark is protected at common law is a matter of appropriation and use, *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and of the mark's character and status in the hierarchy of trademark protection, *i. e.,* whether the mark is generic, descriptive, suggestive, or arbitrary/fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir. 1976). If the YOZERT mark ultimately can be shown to be suggestive, or arbitrary/fanciful, it would require no showing of secondary meaning in order to enjoy protection. Moreover, there can be no requirement here that the plaintiff prove the strength of the mark; all that is required to withstand the motion to dismiss is that the plaintiff be able to allege some set of facts upon which relief can be granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Venturing no opinion on the rights of either party to this mark, it is still plain on the face of it that YOZERT could make a fair run at being held "suggestive," as that term is defined to mean "requir[ing] imagination, thought and perception to reach a conclusion as to the nature of goods." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968).

380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965) (footnotes and citations omitted). Whether the plaintiff pleads "unfair competition" or its subclass "trademark infringement," the "touchstone of both . . . is the likelihood of confusion among prospective purchasers." *Menley & James Lab Ltd. v. Approved Pharmaceutical Corp.*, 438 F.Supp. 1061, 1066 (N.D.N.Y.1977). By doing no more than setting out the competing use of the same mark to designate the same product in the same market, this plaintiff has stated a claim by New York's standards. The magnitude of public confusion, if any, the strength of the mark and the entitlement to it are matters to be left for trial on the merits.

 Plaintiff's third cause of action asks for injunctive relief under New York's "anti-dilution" statute, N.Y. General Business Law § 368–d. Defendants contend that dilution is a concept which extends only to strong and distinctive marks, suggest that plaintiff's YOZERT name cannot qualify as such, and urge that the dilution count be dismissed.

The gravamen of a dilution complaint is that the continuing use of a mark similar to plaintiff's will inexorably have an adverse effect upon the value of plaintiff's mark and that, if plaintiff is not protected, its mark will eventually be deprived of its distinctiveness.

*King Research, Inc. v. Shulton, Inc.*, 324 F.Supp. 631, 638 (S.D.N.Y.1971). Some amount of customer confusion must be shown in order to proceed on a dilution claim. Additionally, the plaintiff may be required to demonstrate the strength of the mark in the state and to offer proof of tarnishment, diversion of trade or other direct injury. *See G. B. Kent & Sons, Ltd. v. P. Lorillard Co.*, 114 F.Supp. 621 (S.D.N.Y. 1953), *aff'd mem.*, 210 F.2d 953 (2d Cir. 1954). For the moment, however, it cannot be said that this plaintiff could not show any set of facts that would merit injunctive relief.

 Finally, the defendants ask dismissal of the plaintiff's fourth and fifth causes of action. These rest on New York statutes providing for cancellation of a trademark registered by the state and for damages arising from the making of false or fraudulent representations to procure such registration. N.Y. General Business Law §§ 367, 368–a. The defendants point out that both statutes provide that actions to enforce the rights they protect may be commenced "in any court of competent jurisdiction," and imply that this forum is somehow impeded from hearing these claims. The suggestion is frivolous. This court is clearly a "court of competent jurisdiction" within the state of New York. *Reagan v. Farmers' Loan & Trust Co.*, 154 U.S. 362, 392, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894). It has jurisdiction to hear these particular claims either as a matter of diversity, 28 U.S.C. § 1332, or as a matter of pendency, 28 U.S.C. § 1338(b). The latter statute directs that "[t]he district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the . . . trade-mark laws." Because the "law of trademark infringement is [simply] a part of the law of unfair competition," *see Corning Glass Works v. Jeannette Glass Co.*, 308 F.Supp. 1321, 1325 (S.D.N.Y.), *aff'd mem.*, 432 F.2d 784 (2d Cir. 1970), the plaintiff's state trademark registration claims fall comfortably within the "unfair competition" rubric. Moreover, they are "related" to the federal claim within the meaning of the statute because the parties are identical, there is a substantial overlap in the evidence, and the claims arise from the same facts and activities. *Cf. Astor-Honor, Inc. v. Grosset & Dunlap, Inc.*, 441 F.2d 627 (2d Cir. 1971).

### Jurisdiction and Venue

 Defendant Hawthorn Mellody is authorized to do business in New York, *see* N.Y. Business Corporation Law §§ 1301 *et seq.*, and is thus "present" here for purposes of personal jurisdiction. Its two subsidiaries, defendant HMD and Hawthorn Wisconsin, are both incorporated in Wisconsin. Neither is authorized to do business here, and each maintains that it is a separate and independent business entity not amenable

to jurisdiction in New York in its own right or through the presence of an alter ego parent. The plaintiff insists otherwise, asserting that both subsidiaries are mere departments of their parent and that their alleged corporate autonomy is merely a fiction for business convenience.

 Just as in diversity cases, the Court must look to the law of the forum in this federal matter to determine whether personal jurisdiction exists. *United States v. First National City Bank,* 379 U.S. 378, 381, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *Car-Freshner Corp. v. Broadway Manufacturing Co.,* 337 F.Supp. 618, 619 (S.D.N.Y. 1971). The operative statutes in New York are C.P.L.R. §§ 301 and 302(a). The former brings the foreign corporate defendant within the power of the court for any cause of action if the traditional test for "presence," *i. e.,* "doing business," is met. The latter is a subsection of New York's long-arm statute that provides a jurisdictional basis for certain causes of action related to the forum in a specific way. The plaintiff has alleged that both bases are proper on these facts. However, because the Court has concluded that HMD and Hawthorn Wisconsin are merely departments of the parent, hence doing business in this state

through the parent, the Court will not address the question of long-arm jurisdiction.

*H.M.D. Corporation*

 New York has well developed precedent governing the propriety of assuming jurisdiction over a foreign corporation having a parent or subsidiary relationship with an entity "present" in the state.[4] *See Delagi v. Volkswagenwerk A. G.,* 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972); *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y. S.2d 378, 224 N.E.2d 877 (1967) *("Royal Bank"); Taca Int'l Airlines S. A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965). In *Delagi* the New York Court of Appeals stated that New York would hold a foreign parent corporation "present" in the state only if its control of a New York subsidiary was "so complete that the subsidiary is, in fact, merely a department of the parent." *Id.,* 29 N.Y.2d 433, 328 N.Y.S.2d 657, 278 N.E.2d 895, 897. In that case, no such dependent status was found. However, the "mere department" language echoed the holding in *Taca, supra,* where the facts did demonstrate the requisite unity and control.[5]

---

4. There are two alternate theories by which a parent or subsidiary may be exposed to the jurisdiction of New York courts.

 The parent may be subject to jurisdiction where the subsidiary "performs all the business" which the parent could do "were it here by its own officials." *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851, 854 (1967); *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir. 1967). Additionally, where the subsidiary is "in fact, if not in name" a branch of the parent, the distinctions between the two fall and the parent is amenable to New York's jurisdiction.
 *Tokyo Boeki (U.S.A.), Inc. v. SS Navarino,* 324 F.Supp. 361 (S.D.N.Y.1971).
 The same standards are applied when it is a subsidiary sought to be reached through the presence of a parent. *See Freeman v. Gordon & Breach, Science Publishers, Inc.,* 398 F.Supp. 519 (S.D.N.Y.1975); *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967). The plaintiff in this action has urged upon the Court only the second base. It has not alleged that

 the agency theory applies here where the parent is licensed to do business in the state but is domiciled and incorporated elsewhere. Therefore, the Court need not decide whether Hawthorn Mellody would be an agent for purposes of accepting service on Hawthorn Wisconsin, nor need it decide whether Hawthorn Mellody is "doing business" in New York in behalf of Hawthorn Wisconsin to the extent that jurisdiction over the latter corporation would be fair and substantially just. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

5. In *Taca* the American subsidiary was held a mere department of the grandparent on the following facts: The English corporation owned, through an intermediate Canadian entity, all the stock of the American subsidiary. The subsidiary sold and serviced Rolls-Royce products. The various Rolls-Royce corporations had some directors in common, and key executives in the American subsidiary were former executives in the English or Canadian companies and were assigned their positions by the parent English company. All of the American subsidiary's net income eventually ap-

In *Royal Bank, supra,* the court articulated a test even stricter than *Delagi* to hold a foreign subsidiary present in New York because its parent was authorized to do business here. There the foreign subsidiary was a separately incorporated French entity, wholly owned by its parent, a Canadian bank. Parent and subsidiary operated virtually as one. The parent carried the assets and liabilities of the subsidiary on its own books; it referred to the subsidiary as a "branch" in its advertising, letterheads and annual report; the subsidiary used the parent's forms for checking, deposits, withdrawals, etc.; the subsidiary's staff was recruited and trained at the parent's office; key personnel shifted back and forth between the two offices. On these indicia of control the court found that the subsidiary was, "in fact, if not in name," the parent, regardless of the separate incorporation.

Even by the *Royal Bank* standard it is clear that the requisite unity and control are present in the relationship of Hawthorn Mellody and HMD. The Court has the benefit of deposition testimony given by John B. White, III, Vice President of Marketing and Sales for the parent and for HMD (hereinafter "Tr."), and of the defendants' responses to the plaintiff's first set of Interrogatories (hereinafter "Int."). These reveal that Hawthorn Mellody, the parent, owns all of the stock of HMD; that HMD's officers are officers of the parent as well; that HMD's five directors are all directors of the parent corporation; that HMD sells only products of companies related to it, *i. e.,* Hawthorn Mellody or Hawthorn Wisconsin; that the subsidiary's address is that of the parent, without a separate name on any door or a definite location for activities; that the subsidiary has no full-time employees, checking account or telephone listing; and that the parent performs for the subsidiary as necessary "services relating to personnel, management, clerical, accounting, secretarial, purchasing,

production, planning, shipping, receiving and warehousing." Response to Interrogatory 22, sworn to Aug. 31, 1978 by John B. White III. In fact, Mr. White frankly admitted that HMD, whose name appears on most of the defendants' products as the "distributor," was formed to "mask Hawthorn Mellody, Incorporated" so that the parent dairy could "manufacture products for resale to [other] dairies who many times don't want to have another dairy appearing on the label." Tr. at 36.

It is abundantly clear that HMD has no independent existence beyond incorporation and that it engages in no business function beyond serving as a screen for sales of Hawthorn Mellody products to those who do not want the original source revealed on the product package. Therefore, it is fair to conclude, as did the New York court in *Royal Bank,* that "by proceeding against the [parent] and the [subsidiary] the plaintiff simply sued the same defendant twice—once in the name by which it is generally known and, again, under the name by which it is known" to its customers. *Id.,* 19 N.Y.2d 131, 278 N.Y.S.2d 381, 224 N.E.2d 877, 879. This Court has jurisdiction over defendant HMD and venue is correct here as to it and to its parent Hawthorn Mellody. 28 U.S.C. § 1391(b)–(c).

### Hawthorn Wisconsin

The jurisdictional facts which apply to this corporation are somewhat less clear than those which apply to HMD. Nevertheless, they are adequate to withstand this motion to dismiss. Hawthorn Wisconsin is incorporated and licensed to do business only in that state, and its business is the processing and production of all of Hawthorn Mellody's YOZERT brand products. All of Hawthorn Wisconsin's directors are directors of the parent and, with the exception of one Assistant Secretary, all of Hawthorn Wisconsin's officers are also

peared on the consolidated balance sheet of the English corporation, and policy for the American subsidiary was created by officers of all the entities. The American subsidiary purchased a car from the English manufacturer only after

the contract for the sale of that car had been consummated with an American purchaser, and the American subsidiary did no other business than through sales and service of the grandparent's products.

officers of the parent. The same Vice President for finance is responsible for maintaining the financial records of the parent and both subsidiaries. Hawthorn Mellody provides personnel, management, accounting, purchasing and shipping services for the Wisconsin company, and further, it provides certain special services such as making computer runs and leasing trucks for the subsidiary. Non-union workers at the Wisconsin facility share a common pension and employee benefit plan with the parent and sister subsidiary. (Unionized workers are covered by a union plan.) Int. 22(b). All payments made by the parent in behalf of the subsidiary are charged to the subsidiary through intercompany accounts; all of the subsidiary's payments for such "debt" go through the parent's master disbursement account; all revenue collected by the subsidiary is transferred to the master depository account; indeed, once funds are deposited by the Wisconsin plant they can only be withdrawn by the parent. All financial transactions between parent and subsidiary are carried on through this master draft and depository system. Only the parent incurs debt from outside sources. However, under the master accounting system "there is borrowing [by the subsidiary] each time a draft is written and repayment by each day's deposits [from the subsidiary]." Int. 24. Interest is charged to the "borrowing" subsidiary at the prime rate. All of these procedures appear to be controlled by the parent.

Beyond these indicia of dominion and control there are other, more subtle indications that the Wisconsin subsidiary is really just a department of the parent. For example, in October 1977, when defendants sought federal registration for the YO-ZERT mark, the application stated that Hawthorn Wisconsin was the owner. Some five months later, when registration for YOZERT was obtained in New York by the defendants, the self-described owner of the mark was HMD. The transfer was made after "internal meetings and discussions on the thing that we just felt that it was best that H.M.D. should own the trademark." Tr. at 117. There is not even an attempt to characterize the transfer of the trademark right as an arm's length transaction for value.

The cavalier treatment of the mark and the numerous references by White to Hawthorn Wisconsin as a "division" of the corporate "we" add to the picture created by the total fiscal integration of the parent and subsidiaries and the executive overlap among them. This and the peculiar circumstance that the defendants' papers do not offer a shred of evidence to support a finding of autonomy with respect to either subsidiary lead the Court to conclude that the three corporations function as "an integral part of a united endeavor." *Freeman v. Gordon & Breach, Science Publishers, Inc.,* 398 F.Supp. 519, 522 (S.D.N.Y.1975).

*Freeman* is particularly appropriate because there the two related corporations performed distinct and critical functions in the operation of a publishing enterprise. The local defendants would negotiate and execute editors' contracts; the foreign defendant would obtain the copyright, publish the volumes, and collect subscription payments for orders received by both companies. The foreign defendant "bought" the product from the local defendant at prices which depended on how much revenue the two defendants wanted to leave on each company's books. On those facts the court declared:

> [W]hile two separate corporate entities have been established, only one commonly owned enterprise exists which, in order to function, must rely upon the joint endeavors of each constituent part.

*Id.* at 522.

Although the parties have not submitted sufficient information to flesh out fully the relationship between Hawthorn Mellody and the Wisconsin operation, the defendants' description of the functions of parent and subsidiary are illuminating. The subsidiary is described as being in the business of "processing and production of specialty dairy products such as yogurt and cottage cheese," and the parent is described as "operating milk and/or ice cream plants and

distributing the items produced at" the subsidiary. Affidavit of John B. White III, sworn to July 24, 1978, ¶ 14(a), (c). The Court is satisfied that Hawthorn Wisconsin is simply the production arm for certain specialized products to be sold by its parent, and that it holds a position no more independent than any of Hawthorn Mellody's other plants. Whatever the reasons for maintaining the subsidiary as a nominally independent entity, they are insufficient to shield the subsidiary from suit in New York where its alter ego parent enjoys the rights and obligations of residence. Therefore, the motion to dismiss for lack of in personam jurisdiction is denied, and likewise the motion to dismiss for improper venue. Venue is correct in this district as one where the parent/subsidiary enterprise is licensed to do business. 28 U.S.C. § 1391(c).

### Transfer of Venue

As an alternative to their motions to dismiss, all defendants have joined in a motion to transfer the case to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a) which reads: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Defendants support their application with the Affidavit of Donald A. Kaul, sworn to Sept. 26, 1978, in which he names a number of defendants' employees and outside advertising consultants who might testify to the events surrounding the birth of the defendants' YOZERT. Not surprisingly, most of these persons reside in or near Chicago. Equally predictable is plaintiff's opposition to the transfer, based on the fact that plaintiff's witnesses on the YOZERT matter reside in the metropolitan New York area. *See* Affidavit of Morton Amster, sworn to Sept. 18, 1978.

It is the movant's burden to make a clear showing militating for section 1404 transfer. *Car-Freshner Corp. v. Auto Aid Manufacturing Corp.*, 438 F.Supp. at 86. However, beyond exposing a stand-off in hardship, these defendants allege only

that transfer is warranted because the docket in the Northern District of Illinois is less congested than the docket in this district. Although the Court may consider that fact in determining whether or not to transfer, it is "not a factor entitled to decisive weight in this district." *Wibau, Westdeutsche Industrie und Strassenbaumachineengelsellschaft mbH v. American Hoist & Derrick Co.*, 293 F.Supp. 273, 275 (S.D.N.Y. 1968). The Court declines to make it dispositive where, as here, the other factors are equally balanced between the plaintiff's and defendants' choices of forum. When that situation occurs there is little justification to deprive the plaintiff of its home jurisdiction, for the rule remains that "unless the balance of conveniences weighs clearly in favor of the defendant, the plaintiff's choice of forum should not be disturbed." *Y4 Design, Ltd. v. Regensteiner Publishing Enterprises, Inc.*, 428 F.Supp. 1067, 1069 (S.D.N.Y.1977).

For all the foregoing reasons the defendants' motions to dismiss for lack of a claim, for lack of in personam jurisdiction and for improper venue, and their motion to transfer the case to the Northern District of Illinois are denied.

So ordered.