**MILLER BREWING COMPANY**

v.

**FALSTAFF BREWING CORPORATION (a Rhode Island corporation) and Falstaff Brewing Corporation (a Delaware Corporation).**

Civ. A. No. 80–0382.

United States District Court,
D. Rhode Island.

Oct. 29, 1980.
On Motion for Stay Jan. 13, 1981.

Edwin Hastings, and Edward J. Regan, of Tillinghast, Collins & Graham, Providence, R.I., Anthony Fletcher, of Conboy, Hewitt, O'Brien & Boardman, New York City, for plaintiff.

David A. Schechter, Providence, R.I., Steven J. Cannata, of Alioto & Alioto, San Francisco, Cal., for defendant.

## OPINION AND ORDER

PETTINE, Chief Judge.

This is an action brought by the Miller Brewing Company for unfair competition and false designation of origin, pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for trademark dilution under Rhode Island law, R.I.G.L. § 6–2–12. Since 1972, Miller has brewed and marketed a reduced calorie beer called LITE. Miller is seeking a preliminary injunction to prevent Falstaff Brewing Corporation from using the symbol "Lite" in connection with its sale of a similar beer product. Jurisdiction exists under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) for the federal claims, under 28 U.S.C. § 1338(b) for the related state claims, and under 28 U.S.C. § 1332(a) for all claims because the corporate parties are citizens of different states.

*Factual Setting*

The rather sparse record in these preliminary injunction proceedings consists of several affidavits and exhibits. The pertinent background facts, which are not in dispute, are as follows.

Miller, a Wisconsin corporation, is the nation's second largest brewer and seller of beer, distributing several brands on a nationwide basis. In 1972, Miller acquired Meister Brau, Inc., a bankrupt Chicago-based brewer, including all rights to existing brands of beer marketed by Meister Brau. One of these brands was LITE, a

reduced calorie beer which Meister Brau had introduced, with only moderate success, in 1967. Miller continued the LITE brand, while spending a year reformulating its recipe, packaging, and advertising. The new label Miller adopted (which remains substantially unchanged today) featured the word LITE in large, dark blue letters on a white background; LITE was the most prominent symbol on the label, with the name "Miller" appearing in fairly tiny letters on the side of the can. *See* Appendix A.

In 1973, Miller began to test market the reformulated LITE in four regions, including Rhode Island, accompanied by intensive advertising. Sales of LITE exceeded 100,000 barrels in 1973, which was more than double the 1972 figure. Miller added over a dozen test markets in 1974; in that year, sales exceeded 440,000 barrels and advertising expenditures exceeded $4 million. Finally, in 1975, LITE was introduced nationwide, advertising costs tripled to $12 million, and sales topped 2.5 million barrels. Sine 1975, sales of Miller LITE have increased steadily, reaching 10.5 million barrels in 1979. Miller has continued its heavy advertising campaign; it spent $27 million in 1979, primarily on commercials during televised sports events.

Although Miller's LITE was the first reduced calorie beer to be sold by a national brewery on a nationwide basis, a few small breweries had marketed similar beers in various locales prior to 1975. The success of LITE brought an avalanche of competition. In late 1975, Jos. Schlitz Brewing Company, one of the nation's largest breweries, introduced a reduced calorie beer called "Schlitz Light Beer." The appearance of numerous regional brands followed quickly, and in 1977 the world's largest brewer, Anheuser–Busch, introduced its "Natural Light" beer. Today, major national and regional brewers make and promote somewhere between two and three dozen brands of reduced calorie beers, many of them denominated "light."

Since Miller began to test market LITE in 1973, no brewery other than Falstaff has attempted to use the symbol "lite" to identify its brand of reduced calorie beer (with three insignificant exceptions, all of which are currently the subject of actual or threatened litigation by Miller).[1] After the filing of this action, but possibly before service of the complaint, Falstaff shipped over 27,000 cases of reduced calorie beer in containers bearing the label "Falstaff Lite" to various cities in fourteen states. All shipments were halted by a temporary restraining order issued by this Court on October 7, 1980.

Falstaff is a Delaware corporation that brews and markets a variety of beers in sixteen states. After deciding to add a lower calorie beer to its product line, and possibly anticipating litigation, Falstaff procured regulatory approval for several different labels to use in connection with the new brand.[2] Two of these labels are identical in all material respects but one. Beneath the word "Falstaff" both display a light blue shield, similar in configuration to that used on the regular Falstaff label, inside of which is printed in white letters the dominant word on the label. On one label the word is "Light," on the other, "Lite." *See* Appendices B & C. Sometime before July 31, 1980, Falstaff began to brew

---

**1.** According to Miller: A "small quantity" of LUCKY LITE has appeared in San Francisco; "minute quantities" of LABATT SPECIAL LITE, a Canadian beer, have been imported into the Buffalo area; "small quantities" of TOOHEY'S LITE, an Australian import, have been reported in several U.S. markets. LUCKY LITE is the subject of suit on the West Coast. Miller has been "advised" that importation of LABATT will be discontinued, and it has "protested vigorously" to the importer of TOOHEY'S. *See* Affidavit of Lauren S. Williams, ¶ 17.

**2.** Falstaff has obtained approval of the Bureau of Alcohol, Tobacco, and Firearms (BATF) for at least five different labels for a reduced calorie beer. In addition to the two discussed in the text, Falstaff has designed three "generic brand" labels–labels containing only the product name with no designation of manufacturer. One contains the word "BASICS" in bold white letters, followed by "LITE Beer," with LITE in even bolder black letters. The other two contain "Light Beer" in black lettering on a white background.

its reduced calorie beer, bottling at least some of it in containers bearing the "Lite" label. Soon after shipment of Falstaff Lite commenced, it was stopped by my order.

*Previous Litigation*

The emergence of reduced calorie beers competing with Miller's LITE was accompanied by considerable litigation. In at least four prior actions, Miller has sought to prevent other brewers from using the word "light" in marketing their brands of lower calorie beer. This case is the first to involve a competitor's attempted use of the symbol "lite," and so it would appear distinguishable on its facts from the cases that have gone before. However, the preceding cases took a broad approach to the legal issues raised by use of the symbols "light" and "lite." Therefore, a review of those cases is necessary to complete the background of the present litigation and to identify potential sources of collateral estoppel.

When Miller acquired Meister Brau in 1972, one of the assets it obtained was the trademark LITE, which had been registered on the principal register of the U.S. Patent Office in 1969. *See* 15 U.S.C. § 1052; *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 427 F.Supp. 1192, 1195–96 (W.D. Wis.1977). Shortly after competing brands of reduced calorie beer started to appear on the market in 1975, Miller began to file trademark infringements actions to enjoin use of the word "light" in connection with sale of this type of beer. Several such actions were pending in November, 1975 when Miller sought a preliminary injunction against the Heileman Brewing Co. Heileman had test–marketed a reduced calorie beer bearing a label on which "LIGHT" was by far the most prominent word. The district court found that LITE was a suggestive term for lower calorie beer, and that the symbol therefore constituted a valid trademark. In the alternative, the court found that if LITE were descriptive rather

than suggestive, Miller "has provided fairly persuasive evidence" that the symbol had acquired secondary meaning which merited protection.[3] *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 427 F.Supp. at 1199–1201. Accordingly, the court issued an injunction. On appeal, the Seventh Circuit reversed. 561 F.2d 75 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Looking solely to definitions of "light" in dictionaries and other reference works and ignoring the evidence of public understanding of the symbol LITE that the trial court had found persuasive, the Court of Appeals concluded:

> The word "light," *including its phonetic equivalent "lite,"* being a generic or common descriptive term as applied to beer, could not be exclusively appropriated by Miller as a trademark "despite whatever promotional effort [Miller] may have expended to exploit it."

*Id.* at 81 (emphasis supplied), *quoting Henry Heide, Inc. v. George Ziegler Co.*, 354 F.2d 574, 576 (7th Cir. 1965).

Strictly speaking, the italicized language was probably unnecessary to the court's decision, for the only symbol allegedly misused was "light." Any doubts about the scope of the *Heileman* holding were, however, soon resolved. Concurrently with the *Heileman* litigation, Miller was attempting to enjoin Schlitz' use of the words "Schlitz Light Beer" on its new lower calorie beer product. Miller's amended complaint in that action alleged not only trademark infringement but also a § 43(a) claim that Schlitz was "palming off" its product as Miller's. After the Seventh Circuit's decision in *Heileman*, Schlitz moved for summary judgment on the basis of collateral estoppel. The district court granted the motion as to both the trademark and the § 43(a) claims. In addition, the court ordered the cancellation of Miller's registration of the mark LITE.[4] *Miller Brewing Co. v. Jos.*

---

**3.** The significance of the labels "suggestive" and "descriptive" to a symbol's protectability are discussed *infra*.

**4.** Schlitz had counterclaimed seeking cancellation of the LITE registrations pursuant to 15

U.S.C. § 1064(c), which directs cancellation when the mark "has become the common descriptive name" for the product.

*Schlitz Brewing Co.,* 449 F.Supp. 852 (E.D. Wis.1978). The Seventh Circuit affirmed in part, stating:

> For purposes of the law of collateral estoppel, [the *Heileman*] decision was a final determination that "LITE" is generic and therefore not entitled to trademark protection .... The district court did not err in ordering the registrations cancelled.

605 F.2d 990, 996–97 (7th Cir. 1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

With respect to Miller's unfair competition claim, however, the Court of Appeals vacated the district court's entry of summary judgment. It reasoned:

> The absence of trademark protection does not mean that Miller must submit to a competitor's palming off its product as the product of Miller. The difficulty of its palming off claim, as presently alleged, is that it is based upon the same facts as the trademark infringement claims.

> *Id.* at 997.

The court remanded the case to permit Miller to further amend its complaint "to state an unfair competition claim if it has one." *Id.* at 998.

*Heileman* and *Schlitz* are the most important of the prior cases. There have been, in addition, two unreported district court decisions. In *Anheuser–Busch, Inc. v. Miller Brewing Co.,* No. 77–100C (E.D.Mo. Aug. 17, 1978), the court granted partial summary judgment for Anheuser–Busch on its claim that it was lawfully using the term "light" in marketing its reduced calorie "Natural Light" beer. The court apparently relied primarily on the preclusive effect of *Heileman.*[5] Echoing the language of the Seventh Circuit, it stated: "In our judgment, 'light beer' is a generic name and 'light' or its phonetic equivalent is a generic or *common* descriptive term as applied to beer and for that reason could not be exclusively appropriated by Miller as its trade-

mark ...." Slip op. at 2 (emphasis in original). In *Miller Brewing Co. v. Olympia Brewing Co.,* No. C77–65T (W.D.Wash. Feb. 27, 1980), the district court denied Miller's request for a preliminary injunction against Olympia's use of the phrase "Olympia Gold–the Right Light." Once again, the court stressed the generic nature of "light" and its phonetic equivalent "lite." The case was subsequently dismissed without further proceedings.

Thus, Miller comes to this Court with a rather impressive record of failures. Ignoring possible differences between the symbol's visual and aural aspects, the Seventh Circuit has held squarely that "lite," as well as "light," is generic for reduced calorie beer. Consequently, the trademark registrations for LITE have been cancelled. With apparently very little left to defend itself, Miller now faces, for the first time, a competitor attempting to use the symbol "lite." Miller contends that the prior cases do not foreclose a § 43(a) claim that its misspelling of "light" is sufficiently distinctive *visually* to identify in the public's mind its own brand of beer. Therefore, it argues, although Falstaff is free to market a reduced calorie *light* beer, it should be prohibited from trading on Miller's good will by using the symbol *lite.* Falstaff's position is that the earlier cases conclusively established that both "light" and its phonetic equivalent "lite" merely name the product, and that "lite" therefore cannot be appropriated to Miller's exclusive use. The legal issue framed by these arguments is simply stated: Can a symbol that is unregisterable because it is generic nevertheless be protected under the unfair competition principles of § 43(a)?

*Protectability of an Unregisterable Mark Under § 43(a)*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides in pertinent part:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation

---

5. *See* note 18 *infra.*

of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

This section creates a limited federal law of unfair competition that is, in certain respects, broader than the trademark infringement provisions of the Lanham Act, 15 U.S.C. §§ 1114–24. As one commentator has noted:

> The emphasis and thrust of trademark protection is in the direction of deciding whether an alleged symbol in fact functions to identify and distinguish the goods or services of one seller .... In trademark law, therefore, it is only the exclusive symbol characterized as a "trademark" which is juxtaposed against another's usage to determine whether or not the two uses by two sellers is likely to confuse customers.
>
> On the other hand, unfair competition law is not so limited in scope. The court need not focus on merely one aspect of plaintiff's total selling "image," as in trademark law. Liability for unfair competition can result from the buyer's likely confusion between two products or services based upon the total impact of all aspects of the parties' selling efforts.... In unfair competition, everything that is likely to have an impact upon the purchaser is relevant to the ultimate determination of whether there is probable "unfairness" or confusion by those purchasers.

1 J.T. McCarthy, *Trademarks and Unfair Competition* § 2:2 at 45 (1973) (citations omitted).

The need for some kind of protection for product differentiation devices that are not technically trademarks is fairly obvious. In order to set their product apart from others in the marketplace, manufacturers use a variety of distinguishing mechanisms.

They may place their house name prominently on the label, or employ a distinctive word or logo. The product may be designed in a particular combination of colors or a peculiar shape. Its packaging may present a distinctive layout by the style of printing, arrangement of wording, use and content of illustrations, etc. Thus, the consumer is aided in selecting the product he or she desires not only by the use of the symbols that we commonly think of as trademarks, but also by a variety of other commercial differentiators that serve a trademark–like function. In order to protect the manufacturer's efforts, and the public's ability, to distinguish one product from the rest, § 43(a) prohibits that kind of unfair competition which is *analogous to* the misappropriation of trademarks and trade names. *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.* 510 F.2d 1004, 1009–13 (5th Cir. 1975); *Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261, 267 (S.D.N.Y.1968). *See Federal – Mogul – Bower Bearings, Inc. v. Azoff,* 313 F.2d 405, 409 (6th Cir. 1963).

█ In view of this broad remedial purpose, courts have recognized that "one need not be the owner of a federally registered trademark" in order to obtain relief under § 43(a). *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 160 (1st Cir. 1977). *See, e. g., DCA Food Industries, Inc. v. Hawthorn Mellody, Inc.,* 470 F.Supp. 574, 579 (S.D.N.Y.1979); *Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173, 178–79 (D.Neb.1971), *aff'd,* 461 F.2d 1088 (8th Cir. 1972). This is not the same thing, however, as Miller's suggestion that the user of an *unregisterable* mark may claim § 43(a) relief. The § 43(a) plaintiff who does not own a federally registered trademark will usually fall into one of three categories: 1) he is using an identifying device–such as shape, layout, or color combination–that is not technically considered a trademark; or 2) he is using a word or logo which is a valid trademark, but which has not been registered even though it could

be;[6] or 3) he is using a word or logo that cannot be a valid trademark, and which is therefore unregisterable.

Most prior cases have involved plaintiffs in the first two categories, and the courts have recognized that such plaintiffs may obtain § 43(a) relief. *Compare Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631 (2d Cir. 1979) (color of drug capsules) *and Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.), *cert. denied*, 424 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) (shape of truck) *with DCA Food Industries, Inc. v. Hawthorn Mellody, Inc.*, 470 F.Supp. 574 (S.D.N.Y. 1979) (*"Yozert"*) *and Ferrara v. Scharf*, 204 U.S.P.Q. 118, 466 F.Supp. 125 (S.D.N.Y. 1979) (*"Ferrara"*). No court, to my knowledge, has confronted the claim of the user of an unregisterable mark that § 43(a) affords him the right to exclusive use of that mark. Under general principles of unfair competition, courts have offered limited relief to first users of symbols that are unregisterable by requiring subsequent users clearly to identify the origin of the product (as by coupling the symbol with their house name).[7] *See, e. g., Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *King–Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963); *Food Fair Stores, Inc. v. Food Fair, Inc.*, 177 F.2d 177 (1st Cir. 1949); *Standard Paint Co. v. Rubberoid Roofing Co.*, 224 F. 695 (7th Cir. 1915).

■ Protecting both the valid, but unregistered, trademark and the device which, though not technically a trademark, serves a trademark–like function, furthers § 43(a)'s goal of preventing confusing and misleading product presentation. It seems to me, however, that in view of the overall structure and underlying policies of the Lanham Act, Miller's claim that § 43(a) provides a right to exclusive use of an unregisterable, generic symbol is untenable. Before I discuss the principles that actuate legal protection of commercial symbols, I wish to emphasize the precise issue presented by this case. Miller has not pressed any allegation that Falstaff's label, by virtue of its coloring, print type, etc., is a trade dress confusingly similar to Miller's own. Although Miller may, of course, advance such an argument at a later point in the case, my own visual comparison of the two labels leads me to believe that such an allegation would be difficult to sustain. My discussion of the interaction of trademark law and § 43(a) is based, then, on the understanding that the parties are fighting over the use *per se* of the word "lite," without regard to any other elements or characteristics of Falstaff's label.

Trademark law is a recognition of the vital role commercial symbols play in the marketplace. In the words of Justice Frankfurter, "If it is true that we live by symbols, it is no less true that we purchase goods by them." *Mishawaka Rubber & Woolen Manufacturing Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942). Once a word or logo comes to be associated by the consumer with a particular brand of product, then it is in the interest of both the consumer and the brand's producer to forbid other manufacturers from concurrently using that same (or a confusingly similar) symbol to mark their brands. The capacity of a symbol to set apart, in the public's mind, one brand from its competitors is the essence of trademarkability. As one commentator puts it:

> *generally* 1 J.T. McCarthy, *supra*, §§ 2:6, 19:4 at 54–65, 657–59. A symbol can, therefore, be a protectable trademark without being registered.

**6.** The federal trademark statute does not create trademark rights but simply provides for trademark publication, *Nashville Syrup Co. v. Coca Cola Co.*, 215 F. 527, 529 (6th Cir. 1919), and for the allocation of burdens of proof in the trial of an action for infringement. *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 427 F.Supp. at 1198, *rev'd on other grounds*, 561 F.2d 75 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). *See*

**7.** Here, Falstaff has already affixed its house name to the label bearing the contested symbol "Lite." Not content with such halfway measures, Miller asserts its right to exclusive use of the symbol.

[I]t is crucial that the symbol in question be so distinctive that it is capable of performing the function of identifying and distinguishing the goods which bear the symbol.

1 J.T. McCarthy, *supra*, § 3:1 at 86.

■ Different words and logos possess different capacities to serve as brand discriminators. Although the question of distinctiveness is often one of degree, trademark cases usually divide the world of commercial symbols into four categories. Considered most distinctive, and therefore most readily protected, are *arbitrary* or *fanciful* symbols (*e. g.*, "Ivory" soap, "Kodak") and *suggestive* symbols (*e. g.*, "coppertone"). The category of symbols known as *merely descriptive* (*e. g.*, "chapstick") can attain trademark status only if they have acquired "secondary meaning," a concept discussed below. The lowest order of symbols, *generic* or *common descriptive* names (*e. g.*, "cola"), can never be appropriated as trademarks. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir. 1976); *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975). *See generally* 1 J. T. McCarthy, *supra*, § 4:2 at 98; §§ 11:1–12:18 at 345–443.

■ The rationale for denying trademark protection to generic words is straightforward. If a word is the common descriptive name for a whole class of goods then, although it enables the public to distinguish those goods from others (*e. g.*, colas from ginger ales), it does not aid them in brand discrimination. Thus, it is often said that

to be a valid trademark, a symbol must signify to the consumer the *producer* not the *product*. *See e. g., Kellogg Co. v. National Biscuit Co.*, 305 U.S. at 118, 59 S.Ct. at 113; *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 255–57 (2d Cir.), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962).

■ The same reasoning underlies the law's treatment of "merely descriptive" symbols. *See generally* 1 J. T. McCarthy, *supra*, § 11:9 at 361. Like generic terms, descriptive symbols are capable of general application to a class of goods. *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.*, 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536 (1911); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d at 254–57. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 9–10. Therefore, in order to establish his exclusive right to employ a "merely descriptive" symbol, the user must show that the symbol "has become distinctive of [his] goods in commerce." 15 U.S.C. § 1052(f).[8] The requisite distinctiveness is termed "secondary meaning." This term is somewhat of a misnomer, for the claimant really must prove that the *primary* meaning of the symbol, in the perception of the consumer, is that the product comes from a particular source.[9] *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. at 118, 59 S.Ct. at 113; *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y.1921). *Cf. Colby College v. Colby College–New Hampshire*, 508 F.2d 804, 807–10 (1st Cir. 1975) (secondary meaning doctrine invoked to determine protectability of college name).

8. Even when the user of a merely descriptive symbol has made this showing and thereby demonstrated his right to register the mark, the Lanham Act, recognizing the continuing utility of the symbol, does not permit the mark's owner to prohibit "fair use" by a competitor "in good faith only to describe to users the goods." 15 U.S.C. § 1115(b)(4). *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 12–13; *Armstrong Cork Co. v. World Carpet, Inc.*, 448 F.Supp. 1072, 1078 (N.D.Ga.1978), *modified on other grounds*, 597 F.2d 496 (5th Cir. 1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 787 (1980).

9. The requirement that the symbol be linked in the public mind with the source or origin of the product does not mean that the consumer must be able to identify the producer by name. Secondary meaning exists if the public understands the symbol to designate "a single thing coming from a single source." *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). *See Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 427 F.Supp. at 1200, *rev'd on other grounds*, 561 F.2d 75 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). It is enough if buyers assume that all goods bearing the symbol come from a common–though perhaps unknown–source.

Although secondary meaning receives most emphasis in cases involving "merely descriptive" symbols, no word or logo can perform as a trademark unless it is able to serve this brand distinguishing function in the public's mind. Thus, it could be said that secondary meaning is a condition precedent to *any* symbol's becoming a protectable trademark. In the case of "suggestive" and "arbitrary"/"fanciful" marks, the law is simply willing to presume that such meaning is present. *See* 1 J. T. McCarthy, supra, § 15:1 at 514. Stated somewhat differently, a symbol's secondary meaning—*i. e.* the public's recognition of the mark as designating *origin* of product rather than *type* of product—is precisely the interest that trademark law was developed to protect. *See Mishawaka Rubber & Woolen Manufacturing Co. v. S. S. Kresge Co.*, 316 U.S. at 205, 62 S.Ct. at 1024. As a corollary, it is only when secondary meaning is present that another producer's simultaneous use of the symbol can create a likelihood of consumer confusion, and the likelihood of such confusion is precisely the harm that trademark law was developed to forestall.[10]

Likelihood of consumer confusion is the heart of a § 43(a) claim as well. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d at 160; 1 J. T. McCarthy, *supra*, § 2:1 at 43. There has been some debate as to whether § 43(a) requires a showing of "secondary meaning," *see, e. g., Colby College v. Colby College–New Hampshire*, 508 F.2d at 807, or of a "unique associat[ion]

with plaintiff's goods," *see, e. g., Joshua Meier Co. v. Albany Novelty Manufacturing Co.*, 236 F.2d 144, 147 (2d Cir. 1956), or of a "distinguishing characteristic," *see, e. g., Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y.1968). Whatever terminology one employs, the fundamental idea is the same. In order to show that the defendant's use of a particular symbol or device (color, shape, print style, etc.) will foster confusion or deception, the plaintiff must first show that the consumer uses the symbol or device to differentiate the plaintiff's product from those of his competitors. Without this brand association, confusion simply could not arise. *See, e. g., Mortellito v. Nina of California*, 335 F.Supp. 1288, 1294–95 (S.D.N.Y.1972).[11] Thus, the commercial identifying devices protected under § 43(a) must possess the same capacity for distinctiveness as does a trademark. This, of course, is the import of the statement that § 43(a) provides relief from activities analogous to trademark infringement.[12]

The conclusion that capacity to serve as a brand discriminator is essential to both trademarkability and § 43(a) protection is not inconsistent with the accepted view that the unfair competition section of the Lanham Act is broader in scope than the trademark sections. The remedial nature of § 43(a) is more extensive in the sense that it will, as noted earlier, safeguard brand identification devices which do not technically come under the heading of trademarks but which, in their totality, act

---

**10.** *See* 15 U.S.C. § 1114(1); J. T. McCarthy, supra, §§ 2:1, 2:3, 2:12, at 43–44, 46, 74–78.

**11.** Cases identifying secondary meaning (or some equivalent term) and likelihood of confusion as the elements of a § 43(a) claim include: *Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631, 641–44 (2d Cir. 1979); *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160–61 (1st Cir. 1977); *DCA Food Industries, Inc. v. Hawthorn Mellody, Inc.*, 470 F.Supp. 574, 578–80 (S.D.N.Y.1979); *Ferrara v. Scharf*, 204 U.S.P.Q. 118, 124–26, 466 F.Supp. 125 (S.D.N.Y.1979); *Combe, Inc. v. Scholl, Inc.*, 453 F.Supp. 961, 963–66 (S.D.N.Y.1978); *Phillip Morris, Inc. v. R. J. Reynolds Tobacco Co.*, 188 U.S.P.Q. 289, 292–94 (S.D.N.Y.1975); *Centsable Products, Inc. v. Goldblatt Bros.,*

*Inc.*, 179 U.S.P.Q. 645, 646–47 (N.D.Ill.1973); *McTavish Bob Oil Co. v. Disco Oil Co.*, 345 F.Supp. 1379, 1381 (N.D.Ill.1972); *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1295 (S.D.N.Y.1972); *Potato Chip Institute v. General Mills, Inc.*, 333 F.Supp. 173, 179–81 (D.Neb. 1971), *aff'd*, 461 F.2d 1088 (8th Cir. 1972); *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 267–68 (S.D.N.Y.1968).

**12.** It is well–established that the showing required under § 43(a) "[i]s analogous to, if not identical with, the likelihood of confusion standard applied in federal trademark infringement actions." *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d at 160. *See Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 559 (S.D.N.Y.1978).

much like trademarks. Additionally, it protects use of valid but unregistered trademarks. To go further, however, and say that § 43(a) protects a generic symbol, which is unregisterable precisely because it lacks the essential capacity for distinctiveness, is to assert that consumers will be confused in a situation where, by definition, no basis for confusion exists. Section 43(a) and the law of trademarks spring from identical legal principles; when applied to one symbol, they should not produce contradictory legal conclusions.

I recognize that some courts have stated or implied that a symbol may be generic for trademark purposes and yet possess secondary meaning. *E. g. Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 9 ("even proof of secondary meaning . . . cannot transform a generic term into a subject for trademark.") *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d at 80 n.6; *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437, 440 (C.C.P.A.1960). If this is so, then Miller could conceivably make out a § 43(a) claim by proving that the public does associate the symbol LITE with one particular source of reduced calorie beer. It seems to me, however, that under a proper analysis there is no such thing as a "generic" word with secondary meaning. If the consuming public does perceive the symbol as designating the producer rather than the product, then the generic label has been incorrectly applied. *See S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696–97 (1st Cir. 1979); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d at 255–57. *Cf. Food Fair Stores, Inc. v. Food Fair, Inc.*, 177 F.2d at 185 (conjunction of two "generic" words capable of designating producer).

The confusion in this area is, perhaps, rooted in the language of the Lanham Act. 15 U.S.C. § 1052(e)–(f) permits registration of a symbol that is "merely descriptive" only on a showing that the symbol has "become distinctive of" the claimant's

goods. 15 U.S.C. § 1064(c) provides that a registered mark may be cancelled if it "has become the common descriptive name" for a product. As discussed earlier, courts have interpreted these two sections as allowing the registration of merely descriptive words only on a showing of secondary meaning, and forbidding the registration of generic (or common descriptive) words altogether. The difference between a *common* descriptive name and a *merely* descriptive word is illusive; the difference between a common descriptive name and a merely descriptive word *without secondary meaning* is illusory. One is tempted to compare the intellectual contortions involved in placing a word or symbol in its "proper" category to the legendary scholastical pursuit of numbering the angels that can dance on the head of a pin.

I believe that the perceived need for attaching labels like "generic," "descriptive" or "suggestive" to marks has often obscured the fundamental policies involved. The law permits exclusive appropriation of commercial symbols when those symbols aid the consumer in identifying and selecting, from the plethora of competing brands, the particular brand he or she desires. As Learned Hand stated, "The single question, as I view it, in all these cases, is merely one of fact: What do buyers understand by the word for whose use the parties are contending?" *Bayer Co. v. United Drug Co.*, 272 F. at 509. If the acid test of a symbol's capacity to differentiate is public perception, then the process of labelling for purposes of protectability cannot be undertaken without reference to that perception. A word or logo should not be branded "generic" because a judge decides that it looks generic to him or her. Likewise, while the dictionary entry for a word is some evidence of what the public may understand it to mean, dictionary definitions should create at most a rebuttable presumption of what the consumer's perception is.[13] To

**13.** *Compare S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d at 696 (court found "the Mart" presumptively generic based on dictionary definition but considered whether a shift in public understanding of the term had rebutted the presumption) *with Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d at 80–81 & n.6 (court relied exclusively on dictionary

label a word or logo "generic" in the face of the admitted presence of secondary meaning is to assert that every word has some absolute, inherently correct characterization that the law will discern without regard to what the public may *think* the word means.

The insistence that no amount of secondary meaning can save a generic mark has been justified by an argument that deserves mention because of its plausibility. If, the reasoning goes, a single producer could appropriate the name of the product to his exclusive use, then competitors would not be able to call their version of the product what it really is. *See, e. g., CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d at 13. At first glance, this point appears eminently reasonable and virtually unarguable. I believe, however, that appearance is deceptive, for the conclusion is derived from the unsound premise that the "name" of a product is somehow divinable apart form the commercial context in which it appears. If the public actually perceives a symbol as representing the product's *name*, then no one producer will be able to appropriate that mark to his brand because secondary meaning and likelihood of confusion cannot be proved. If, however, the public perceives the symbol as representing the product's *origin*, should a court refuse to protect the mark because it believes that the public has mistakenly attached brand significance to what is in truth a common descriptive name? I submit that the "true" meaning of a symbol can be nothing more, or less, than what the public thinks it means.

 With this understanding of what the label "generic" properly represents, I reject the suggestion that a symbol which is a common descriptive name for trademark purposes might nevertheless support a § 43(a) claim.[14] I view "generic-

definition of "light" despite evidence of public perception of the significance of LITE).

Resort to the dictionary would seem to be most justified in circumstances where the symbol has an insufficient public exposure for reliable data on consumer perception to be available. The prime example of this kind of situation is the case where a producer wishes to register a mark that it is just beginning to use. In such a case, "The sole issue [is] whether the mark is *capable* of indicating origin of [the claimant]'s goods to an ordinary purchaser." *Application of Wella Corp.,* 565 F.2d 143, 144 (C.C.P.A. 1977).

Once direct evidence of public understanding of the symbol's significance is available, overemphasis on the dictionary is less warranted—especially since such reference works generally lag behind media-encouraged changes in the linguistic habits of the consuming public. When a symbol has actually been in use for a sufficient period of time to gauge consumer response, the focus of analysis should shift from inquiry into whether the symbol is capable *in the abstract* of serving a brand distinguishing function to consideration of whether the symbol is *in fact* serving that function in the contemporary marketplace. *See, e. g., In re Warren Petroleum Corp.,* 192 U.S.P.Q. 405 (T.T.A.B.1976) (hearing examiner refused to register "XTRA" on grounds that it was "inherently incapable of functioning as an indicia of origin;" Trademark and Trial Appeals Board reversed, emphasizing that in view of the symbol's seven year usage, public perception was the crucial factor).

14. Miller points to certain language in the Seventh Circuit's *Schlitz* decision as supporting its contention that a competitor's use of an unregisterable symbol may give rise to a § 43(a) claim. Although I was initially inclined to agree with Miller's reading, further consideration has led me to reject the notion that the *Schlitz* court believed that the mere use of the word "lite," without more, would constitute unfair competition. The pertinent language, quoted in part earlier in the text, is as follows:

The absence of trademark protection does not mean that Miller must submit to a competitor's palming off of its product as the product of Miller. The difficulty with its palming off claim, as presently alleged, is that it is based upon the same facts as the trademark infringement claims. These facts are in substance that Miller sold large quantities of light beer under the trademark "LITE," expended large sums to promote that trademark, and thereby succeeded in gaining recognition for the word among beer drinkers as the name for Miller's light beer; and that Schlitz intends to sell a beer labelled "Schlitz Light Beer," which will cause consumer confusion because of the similarity of "LITE" and "Light," which are pronounced identically. Miller does not allege that consumer confusion or a likelihood thereof arises from failure of Schlitz adequately to identify itself as the source of its beer; from a confusingly similar dress used by Schlitz for its beer, which might result from such factors as the label's style, the relative size of words in the label, the configuration and color of the

ness" and "secondary meaning" as opposite sides of the same coin. A word is generic if it has no secondary meaning; conversely, if "the primary significance of the term in the minds of the consuming public is not the product but the producer," then the word is not generic. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. at 118, 59 S.Ct. at 113. Because the capacity to serve as a brand discriminator is essential to both a trademark and a § 43(a) claim, I hold that where a symbol is denied trademark registration because it is generic, then the use, without other aggravating circumstances, of the symbol by a competitor is not actionable under § 43(a). To hold otherwise would be to suggest that a producer might employ § 43(a) to obtain the very thing–a legally–sanctioned monopoly in a symbol–that he has been denied under the trademark laws.

*The Current Status of LITE and Questions of Collateral Estoppel*

My conclusion that a competitor's use of an unregisterable generic mark will not, without more, support a § 43(a) claim does not mean, however, that Miller cannot prevail in this action. It appears to me that, regardless of its character at an earlier time, LITE may no longer be generic. If LITE is capable of trademark stature today, then it is clearly protectable under § 43(a). *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d at 160–61.

The legal status of commercial symbols can change over time to reflect shifts in consumer perception of their significance. *Cf. S. S. Kresge Co. v. United Factory*

*Outlet, Inc.*, 598 F.2d at 696 (recognizing that change in usage could alter a word's generic status, but finding that such a shift has not yet occurred in the case of "The Mart"). Even the most distinctive symbols–coined words having no descriptive or suggestive quality–may become generic if they are adopted by the public as the name of the product rather than as the mark of the producer. Familiar examples are Aspirin, Cellophane, and Thermos, all of which were once, but are no longer, trademarks of a single manufacturer. *See Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y.1921); *DuPont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); *King–Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963).

In these cases, the courts held that, due to changes in market conditions, the public no longer perceived the trademark significance of the symbol at issue; rather, consumers had adopted the mark as the name of the product behind the symbol. As the Aspirin, Cellophane and Thermos examples suggest, the symbols that fall most readily into public usage as generic names are often associated with products that are themselves novel items which the consumer has never before encountered. In such circumstances, the mark placed on the product cannot function to distinguish one manufacturer from another because there is little or no brand competition. Thus, the public recognizes the new symbol not as a brand name but as the name of a new product.[15]

label, and even the misspelling of "light" in the label; from Schlitz' use of advertising calculated to lead to confusion; or from any cause except Schlitz' use of the word "light" in the product name "Schlitz Light Beer." Since Schlitz is entitled to use that word in describing its beer, that use alone cannot give rise to an unfair competition claim.
605 F.2d at 997 (footnote omitted).
I believe that the court was referring to claims of confusingly similar trade dress, which would require a totality of factors that might lead consumers to mistake a competitor's label for Miller's. As I have indicated earlier, Miller has not pressed such a claim here. In the last sentence of the quoted section, the *Schlitz* court emphasized that merely the use of the

word "light" would not give rise to a § 43(a) claim. Since it appears that the Seventh Circuit considered "lite" as generic as "light," I do not believe that it was suggesting that the use *per se* of "lite" would be actionable under § 43(a).

15. Another related reason why symbols identifying new products often become adopted as the name of the product is that the public frequently is offered no alternative term to adopt as the common name of the item. The manufacturer may choose a symbol that has the capacity to be a brand discriminator but then uses the word as if it were the name of the product. When a buyer sees a box labelled "ASPIRIN" in bold type, with "acetylsalicylic

With these considerations in mind, I return to examination of the factual and legal bases of the *Schlitz* holding that Miller's misspelling of "light"–LITE–merely names a product. When Miller introduced LITE nationwide in 1975, it presented to the public a virtually unknown product. Miller's promotional efforts caused consumer recognition of reduced calorie beer to skyrocket. Beer drinkers encountered a new product, "light beer," and by far the most visible producer was selling LITE beer. Thus Miller faced the danger that consumers would regard its symbol as the name of the product rather than as an indicator of the product's source. That the symbol LITE and the name "light beer" are pronounced identically compounded the difficulty, and further diminished LITE's capacity to function as a brand discriminator.

Then, other reduced calorie beers began to appear, with names like Heileman Light Beer, Schlitz Light Beer, Olympia Gold Light Beer, Pabst Extra Light, Michelob Light, and Natural Light Beer. The symbols adopted by Miller's competitors–in many cases, the house name followed by the words "light beer"–were distinctive enough to identify their brands of reduced calorie beer. As the market was flooded with light beers, Miller persisted in designating its product LITE. Thus, the public began to *see* LITE against a background of competing labels.

Clearly, the characteristics of the market for this product have changed dramatically since the first Miller case was heard by the trial court in 1976. Assuming that the common descriptive name of the product is "light beer," it is reasonable to ask whether, in a world full of competing *light* beers, Miller's symbol LITE is currently capable of serving as a description of product origin–*i. e.*, a trademark.[16] If so, then Miller's claim to § 43(a) protection rests on a firmly established footing.

The material facts that determine the protectability of LITE are, first, its capacity to distinguish Miller's brand from others and, second, public recognition of the symbol's significance. Both are affected by the objective changes in the reduced calorie beer market described above. It is very possible that the evidence will show a corresponding subjective change in consumer perceptions. The proliferation of labels describing reduced calorie beer as *"Light Beer"* may have altered public understanding of the symbol LITE by shifting attention from the mark's aural similarity to its visual dissimilarity. In 1975–76, Mil-

---

acid" in very small letters, it is understandable that the former catches on as the name of the product itself.

**16.** In asserting that Miller's misspelling of "light" is incapable of being a trademark, Falstaff relies heavily on *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.*, 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536 (1911). This case was the only authority cited by the Seventh Circuit in *Schlitz* for the proposition that "a generic term cannot be appropriated through the device of misspelling it." 605 F.2d at 996.

The symbol involved in *Standard Paint* was "ruberoid," a misspelled version of the word "rubberoid" which means "an imitation of hard rubber." 220 U.S. at 455, 31 S.Ct. at 457. The Court held the symbol unprotectable. Initially, it must be noted that under then–existing federal trademark law, descriptive terms were not trademarkable *regardless of the presence of secondary meaning*. The dispute, then, was whether "ruberoid" was suggestive, and therefore capable of protection, or descriptive, and therefore unprotectable. Putting aside the question of labels, it is clear that the Court's

analysis focused on 1) the symbol's capacity for distinctiveness and 2) the public perception of its meaning. "Rubberoid" is not a word in common usage; it is extremely unlikely that the omission of one "b" would be remarked by the majority of consumers as a distinctive spelling of the word. Recognizing this, the Court stated rather cryptically that bad spelling is not "so rare or *so easily detected* as to make the word an arbitrary sign of something else than its conventional meaning." *Id.* at 455, 31 S.Ct. at 458 (emphasis supplied). While the statement is undoubtedly accurate on the facts of that case, the contrast between LITE and "light" might present a different question. The Court in the *Ruberoid* case framed the question: "Does [the symbol] have relation to the origin or ownership of the [product], or is it merely descriptive of [the product]?" *Id.* at 454, 31 S.Ct. at 457. Thus, far from establishing any general rule that misspellings of common words can never be trademarks, the case illustrates the primacy of the factors discussed earlier in the text.

ler attempted a trademark usage of LITE and failed, both because of the phonetic identity of LITE and "light" and because there was little in the reduced calorie beer market at that point in time for the symbol to distinguish Miller's product from. Now, five years later, the problem of phonetic identity remains, but today's beer–purchasing public sees one brand using the visual configuration L–I–T–E against a backdrop of as many as three dozen competing brands using the visual configuration L–I–G–H–T.

For the symbol LITE to shift from being a common descriptive term to being a protectable mark that functions as a brand discriminator would not be unprecedented. Commentators have labelled this phenomenon the "recapture" of a product's name for use as a trademark. *See* 1 J. T. McCarthy, *supra*, § 12:10 at 423–24. The most famous example concerns the symbol "Singer." In 1896, shortly after certain of the Singer Company's patents expired, the Supreme Court held that the mark "singer" had become the generic designation of automated sewing machines for noncommercial users. *Singer Manufacturing Co. v. June Manufacturing Co.*, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896). Singer continued to use the mark on all of its products, however. In 1953, the Fifth Circuit affirmed a district court ruling that, by virtue of the Company's extensive advertising and the proliferation of brands in competition with the formerly patented machines, the mark "Singer" had been reclaimed from the public domain for all purposes. *Singer Manufacturing Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953).

The sixty–year span of the Singer story is, of course, considerably longer than the five–year period involved in this case. But that difference simply means that Miller carries a heavier burden of proving that recapture has occurred. This Court cannot say as a matter of law that five years is too brief a time for the appearance of LITE to have acquired a protectable secondary meaning in the consumer's mind. This is so especially in view of the evolution in advertising style and intensity that has accompa-

nied the rise of the electronic media. Considering the pervasive infiltration of the public consciousness that can be achieved by an aggressive ad campaign, I am not prepared to say that today's manufacturer could not accomplish in five years what it might have taken a manufacturer fifty years to accomplish in the first half of the century. *Cf. Maremont Corp. v. Air Lift Co.*, 463 F.2d 1114, 1118 (C.C.P.A.1972) (finding it conceivable that a trademark could become generic in as little as thirteen months).

■ It must be asked, however, whether Miller will be permitted to argue that LITE is no longer generic—and therefore registerable and protectable under § 43(a)—in view of prior holdings to the contrary. The Seventh Circuit stated in *Schlitz* that *Heileman's* determination that LITE is generic "is an insuperable obstacle to Miller's claims based on its ownership of trademark rights in 'LITE' in that case [citation omitted] and in all other cases." 605 F.2d at 996 (emphasis supplied). Although this language appears absolute, I do not believe that Miller is estopped from attempting to establish that, by 1980, LITE has acquired the secondary meaning essential to protectability.

■ In order to successfully assert collateral estoppel, one must "identif[y] the issue in suit as the identical question finally decided against [the estopped party] or one of his privies in previous litigation." *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). If we reject the notion that every symbol possesses an absolute and immutable legal characterization impervious to any change in public understanding of the symbol's significance, then we must recognize that the status of an actively–used symbol at one point in time may be a different question from its status at another point in time. "[A]n intervening factual change can displace a factual issue on which the initial judgment depended, so that collateral estoppel becomes inapplicable." 1b Moore's *Federal Practice* ¶ 0.448 at 4232. In four

prior cases, Miller has failed to prevent another brewer from using the word "light." [17] All of those cases contain language to the effect that "lite"—as the phonetic equivalent of "light"—is generic. However, the legal conclusions in three of the four are ultimately derived from a factual record assembled in early 1976.[18] The fourth case has a problematic collateral estoppel effect because there is some question as to whether a final judgment was entered and, if so, as to what it encompassed.[19] To the extent that that case does have some estoppel consequences, I am convinced that

the only issue decided there was the secondary meaning of the sound of LITE.[20] Therefore, the only question that has been conclusively resolved by prior litigation is that, in the 1976 commercial context, LITE, like "light," was a generic symbol for reduced calorie beer. No court has considered the question whether LITE is generic in the 1980 commercial context. Because this is a distinct legal issue, and because I believe that a change in the material facts governing protectability has probably occurred, I hold that Miller is not estopped to argue that LITE now possesses the secondary

**17.** In chronological order, the four are:

*Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,* 561 F.2d 75 (7th Cir.), *rev'g* 427 F.Supp. 1192 (W.D.Wis.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). *Miller Brewing Co. v. Olympia Brewing Co.,* No. 77–65T (W.D.Wash. Feb. 27, 1978) (order denying preliminary injunction). *Anheuser–Busch, Inc. v. Miller Brewing Co.,* No. 77–100C (E.D.Mo. Aug. 17, 1978) (order granting partial summary judgment against Miller). *Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990 (7th Cir. 1979), *aff'g in part and vacating in part* 449 F.Supp. 852 (E.D.Wis. 1978), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

**18.** The 1979 holding in *Schlitz* that LITE is unregisterable was based on the collateral estoppel effects of the *Heileman* decision, rendered in 1977. *Heileman,* in turn, involved alleged acts of trademark infringement that occurred in early 1976. *Anheuser–Busch,* the most recent case holding that "lite," as the phonetic equivalent of "light," is generic, also relied on collateral estoppel emanating from *Heileman.* According to Miller's affidavits in this case, Anheuser–Busch presented no factual evidence in that case, but rather relied solely on legal arguments regarding estoppel. *See* Affidavit of Anthony L. Fletcher, ¶ 2.

It must also be emphasized that none of these cases explored the possibility that the visual dimension of LITE might possess a secondary meaning apart from the symbol's aural dimension. The prior decisions repeatedly refer to "light, including its *phonetic* equivalent, lite." The likelihood of confusion resulting from a competitor's use of the configuration l-i-t-e was not considered for the simple reason that none of the other brewers were attempting to use that symbol. *See* note 20, *infra.*

**19.** *Olympia Brewing* had a rather peculiar procedural course. An order was entered denying Miller a preliminary injunction against Olympia's use of "light." The case was then dismissed without further proceedings. The order denying preliminary relief was not vacated, but the dismissal was entered without prejudice to any allegations in Miller's complaint except those asserting that Olympia's use of "Olympia Gold—The Right Light" violated Miller's rights.

It should be noted that the *Anheuser–Busch* order may also lack the finality necessary for collateral estoppel to attach. Miller has moved to modify, alter or amend the order to make it final and appealable, but the motion has not been acted upon. *See* Affidavit of Anthony L. Fletcher, ⁋ 2.

**20.** In his 1978 order denying Miller preliminary relief against Olympia, Judge Voorhees stated: "Nor has LITE acquired a secondary meaning requiring protection." Order Denying Plaintiff's Motion for Preliminary Injunction at 2. My conclusion that this statement refers to the *sound* of LITE rather than to its *appearance* is based in part on the factual setting of the case—Olympia was using "light" not "lite." More important are certain statements made by Judge Voorhees when, prior to his written order, he orally announced his denial of Miller's preliminary injunction request. According to the transcript, after concluding that "the word L–I–T–E has not acquired a secondary meaning that requires protection *here,*" he explained:

The registered trademark of [Miller] is for the word "LITE"—L–I–T–E—in a certain configuration. *I would certainly protect that registered trademark if I felt that it were being infringed upon by the defendant,* but I do not find such infringement because the word L–I–T–E . . . is not being used by the defendant. The word that is being used by the defendant is the word "Light"—L–I–G–H–T—and the registration of L–I–T–E does not in my opinion protect the *sound* of the combination of the letters L–I–T–E.

Transcript of Court's Oral Opinion on Plaintiff's Motion for Preliminary Injunction at 3 (emphasis supplied).

meaning needed for trademark status [21] and § 43(a) relief.

## The Appropriateness of Preliminary Relief

To obtain preliminary relief, the plaintiff must show either a substantial likelihood of success on the merits coupled with the possibility of irreparable harm, or the presence of novel or difficult questions of law with a balance of hardships tipping decidedly in favor of the moving party. *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir. 1979); *Grimard v. Carlston*, 567 F.2d 1171, 1173 (1st Cir. 1978); *U. S. v. Pennzoil Co.*, 252 F.Supp. 962, 985–87 (W.D. Pa.1965); 7 Moore's *Federal Practice*, ¶ 65.-04[1], at 35–47. In either case, the issuance of the injunction must serve the public interest. I conclude that Miller is entitled to a relief under either standard.

The possible shift in consumer perception that may signal "recapture," the ability of advertising to create a separate visual existence for a symbol, and the legal and practical consequences of protecting a symbol in its visual, but not its aural, form are thorny issues that will require full airing at trial and more deliberate consideration than this Court has been able to give them in the 20 days since it issued a temporary restraining order in this case. The balance of hardships decidedly favors Miller, which has at stake the alleged reputation of a brand name built up at enormous expense. Falstaff's investment in "Lite" is, at this point, quite small in comparison. Moreover, Falstaff is not without alternatives. It is free pending trial to market its reduced calorie beer under the name "Light" [22] or under some other symbol, in-

---

**21.** There is a split of authority on the question whether a misspelling of an otherwise common or descriptive word may be a valid trademark. "Jymbar" (for "gym bar"), "Safe T Plug," and "Al–kol" (for "alcohol") have been denied federal registration. *See AMF, Inc. v. Battle Creek Equipment Co.*, 167 U.S.P.Q. 375 (TTAB 1970); *Harvey Hubbell, Inc. v. Dynamic Instrument Corp.*, 165 U.S.P.Q. 412 (TTAB 1970); *American Druggists' Syndicate v. United States Industrial Alcohol Co.*, 2 F.2d 942 (D.C.Cir. 1924). On the other hand, "XTRA" and "Alo" (for skin cream made from the aloe plant) have been found to be valid trademarks. *See In re Warren Petroleum Corp.*, 192 U.S.P.Q. 405 (TTAB 1976); *Aloe Cream Laboratories, Inc. v. Aloe 99, Inc.*, 188 U.S.P.Q. 316 (TTAB 1975). *Cf. Application of Wella Corp.*, 565 F.2d 143 (C.C.P.A. 1977) (allowing registration of a particular, stylized lettering of the generic term "balsam").

If the objection to allowing registration of a misspelling is rooted in the insistence that "generic is generic is generic" even though the public might perceive the misspelling as a brand discriminator then I suggest that the objection is invalid for the reasons given earlier in the text. I find persuasive, and more attuned to the commercial reality in which symbols operate, the approach of the Trademark Trial and Appeal Board in the "XTRA" case. The Board concluded

> that the term "EXTRA" is a laudatory or highly suggestive term as applied to most goods and services, but that this alone does not signify, as the Examiner has indicated, that it is inherently incapable under any and all circumstances of functioning as an indicia of origin for certain goods and services; that

the term here in question, "XTRA," although a phonetic equivalent of "EXTRA," is not "EXTRA," per se; that while the difference is the omission of one letter, this slight variation cannot be overlooked because *one can never predict the effect of this difference coupled with constant exposure over a considerable period of time as the only indicia of origin for certain goods and services.*

192 U.S.P.Q. at 407 (emphasis supplied); *see Aloe Cream Laboratories, Inc. v. Aloe 99, Inc.*, 188 U.S.P.Q. 316, 326 (TTAB 1975). A more convincing objection to allowing misspellings to achieve trademark status is the fear that the owner of a misspelled mark might be able to prevent others from using the proper spelling and the sound of the underlying word. This was essentially what Miller was attempting to do in its prior cases. This legitimate concern can be met, however, by the simple practice of requiring the user of a misspelling to disclaim any rights in the proper spelling and sound of the mark as a condition for registration. *See* 15 U.S.C. § 1056 (providing for disclaimers). Obviously these limitations will diminish the strength of the misspelled symbol, but if a producer is willing to bank on his ability to create the necessary association in the public's mind through the symbol's *visual* effect, why should his efforts not be protected? Moreover, good faith use of the correctly spelled word by a competitor to describe his product will be protected by the "fair use" defense of 15 U.S.C. § 1115(b)(4); *see In re Warren Petroleum Corp.*, 192 U.S.P.Q. at 408.

**22.** Falstaff suggested at the hearing on the motion for a temporary restraining order that it could not market its reduced calorie beer under

cluding any misspelling of that word except "Lite."

■■■■ Alternatively, I conclude that Miller is likely to succeed in proving that the consuming public has come to associate the symbol LITE with one particular brand of reduced calorie beer. The First Circuit has identified four factors that have particular relevance to the existence of secondary meaning: 1) long and exclusive use of the symbol; 2) size or prominence of the enterprise; 3) promotional efforts surrounding the symbol; and 4) direct evidence of public recognition in the form of surveys or similar evidence. *Colby College v. Colby College–New Hampshire*, 508 F.2d at 807–10. Viewing the present case in light of these factors, I believe that Miller will be able to demonstrate the secondary meaning necessary to justify § 43(a) relief.

■■■ The piece of evidence most strongly supporting this conclusion is the fact that, with insignificant exceptions, *no brewer other than Miller has ever used "lite" to identify a reduced Calorie beer*, even though well over two dozen competing brands are now on the market. Thus, LITE presently signifies only Miller's product. *Colby College* posits long and *exclusive* use as an important determinant of public understanding of a symbol's significance.[23] In that case another college, and in this case numerous competing brewers, have used a very similar identifying symbol for some time. But, just as "Colby Junior College for Women" was different enough to permit the public to recognize the distinctiveness of "Colby College," so, here, the use of "Light" by many other brewers may leave LITE standing apart from the crowd.

If consumers have noticed the misspelling at all, then the symbol may merit protection. *See Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 559 (S.D.N.Y.1978).

In this case, it is reasonable to believe that consumers *have* noticed the misspelling. Miller's packaging and commercial displays have consistently featured LITE as the prominent—indeed, the only—symbol identifying the product. LITE is by far the most eye–catching word on Miller's labels. The slogan "A Fine Pilsner Beer" is displayed in much smaller letters on the face of the label, but the house name "Miller" appears only on the side in tiny, virtually unreadable type. This is not a case, then, where a symbol "did not 'take on trademark characteristics' because [the plaintiff] did not 'give [the mark] a conspicuous position in its marketing and display techniques without giving prominence to [the house name or other distinctive symbol].'" *Phillip Morris, Inc. v. R. J. Reynolds Tobacco Co.*, 188 U.S.P.Q. 289, 292–93 (S.D.N.Y.1975), *quoting Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 256 (2d Cir. 1962) (holding that "lights," *per se*, had no secondary meaning because *inter alia* it was always used in conjunction with the strong mark "Marlboro").

The degree of visibility that LITE has attained by virtue of heavy advertising and the increasing sales of containers bearing the symbol further supports the inference that LITE stands in the minds of the public as "a single thing coming from a single source." *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). Of course, as Falstaff points out, "a

the name "light" because it currently uses that word to describe its light–in–color beer. This information certainly affects my estimation of the harm Falstaff will suffer if an injunction against the interim use of "lite" is issued. Its weight, however, is much diminished by the fact that Falstaff, when seeking B.F.T.A. approval of its "Lite" label, also sought and received approval for an identical label substituting the word "Light." *See* note 2 *supra*. Presumably, then, Falstaff did not consider it impossible to market its reduced calorie beer as "light."

**23.** For essentially the same reasons that I accept the possibility of recapture occurring within five years, I believe that the approximately ten years in which Miller has used LITE may be long enough to meet the *Colby College* "long and exclusive use" standard. Presumably, the greater the frequency and intensity with which a symbol is placed before the public, by means of advertising, the shorter the time which must pass before an inference of secondary meaning arises.

mere showing of advertising does not provide a basis for determining the extent of customer awareness of a mark." *See Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 411 (S.D.N.Y.1974). Secondary meaning is shown by the success, rather than by the mere fact, of promotional efforts. However, as the First Circuit explained in *Colby College,* "the normal consequence of substantial publicity may be inferred." 508 F.2d at 808.

Miller has spent approximately $90 million in advertising LITE beer. I discount that expenditure somewhat, for much of the money went to television advertising spots in which someone, often a sports celebrity, talks about "LITE [light?] beer from Miller." Although these ads do contain shots that project images of cans and bottles bearing the symbol, it is not clear on the record before me how much of the television advertising was in essence aural rather than visual. Nevertheless, LITE has been placed squarely in the public eye by sales, since 1975, of nearly 10 billion cans and bottles bearing the LITE label. For five years every purchaser of reduced calorie beer has seen Miller's LITE standing on a shelf in the midst of an increasing number of competing "Light" beers. In addition, advertising in magazines and on billboards displays the word for potential customers to see.

Falstaff's principal objection to the inferential evidence of secondary meaning just described is that "lite" has been declared "generic" on four previous occasions and therefore cannot have a secondary meaning. For the reasons already discussed, I do not consider the previously–applied "generic" label to be dispositive of LITE's current status. Falstaff's position presents a naked legal conclusion rather than factual evidence contravening the suggested existence of LITE's secondary meaning at this time.

Miller has also introduced direct evidence of consumer awareness of LITE's significance in the form of survey data. This evidence is less than compelling for several reasons. The survey was undertaken in 1975. It purports to demonstrate that 55% of a national probability sample of beer drinkers interviewed by telephone were "aware" of Miller's LITE, so spelled. The primary deficiency of this data is its age. I am troubled by the fact that Miller, with so much at stake, has not commissioned a more recent survey. Additionally, the questions may have been somewhat leading. Requesting a survey respondent to *spell* the names of the brands of reduced calorie beer of which he or she is aware is likely to suggest to the respondent that some unusual spelling is involved.[24] In sum, I do not consider Miller's 1975 survey data very useful. Falstaff's suggestion that "[t]he time lapse is especially important because meanings of words change over time" is unhelpful in view of my conclusion that the effect of changed circumstances in the market for reduced calorie beer has probably been to increase, rather than decrease, public perception of LITE's significance.

I rely, therefore, on Miller's exclusive use of LITE, its extensive advertising, and the substantial sales of containers bearing the LITE label in concluding that Miller will probably be able to demonstrate at trial that the symbol now fulfills a brand discriminating function for a substantial portion of the consuming public.[25] The First Circuit has said that this type of circumstantial evidence, taken together, may be

---

**24.** I do not believe that the possibly leading nature of such a survey would make it inadmissible. The issue would seem to be primarily one of credibility. The whole problem could perhaps be obviated, however, by use of a written survey. There, the importance of the spelling would be disguised by the format itself.

**25.** Miller will not have to show that the symbol is universally understood to signify its brand of reduced calorie beer.

There is sufficient secondary meaning as long as a significant quantity of the consuming public understands a name as referring to the appropriate party, for it is undesirable that such a quantity be deceived even if some, relatively small, number is not. *Colby College v. Colby College–New Hampshire,* 508 F.2d at 807.

enough to support a finding of secondary meaning. *Colby College v. Colby College–New Hampshire*, 508 F.2d at 808. At this preliminary stage in the case, I am willing to accept its sufficiency. This conclusion does not, however, diminish the importance of direct evidence of consumer attitudes at trial. Public perception is the critical determinant of a symbol's protectability, and Miller's ultimate success will hinge on what it can prove about public reaction to LITE in the contemporary marketplace.

 The conclusion that Miller is likely to succeed in demonstrating secondary meaning mandates the further conclusion that it will suffer irreparable harm if Falstaff's use of "Lite" is not enjoined *pendente lite*. If secondary meaning exists, then contemporaneous use of the identical symbol by another producer will necessarily create the likelihood of consumer confusion. For this reason, it is generally agreed that in cases involving allegedly illegal use of trade symbols, the possibility of irreparable harm is inherent. *E. g., Boston Professional Hockey Association v. Reliable Works*, 178 U.S.P.Q. 274, 278 (E.D.Wis.1973); *see* 2 J. T. McCarthy, *supra*, ¶ 30:18 at 344–45. The right being claimed is the right to exclusive use; if the competitor is not restrained pending trial, the alleged commercial significance of the plaintiff's symbol will be undermined, with resulting loss of trade and customer good will.[26]

Similarly, the probability that Miller will succeed in demonstrating the brand distinguishing nature of LITE at trial justifies the conclusion that Falstaff's interim use of the identical symbol would be contrary to the public interest. If consumers associate a symbol with one particular producer, then use of that symbol by another producer will mislead the public regarding the source of the merchandise. *See Ferrara v. Scharf*, 204 U.S.P.Q. 118, 124, 466 F.Supp. 125 (S.D.N.Y.1979).

One final point should be addressed. Because the issuance of an injunction lies in the sound discretion of equity, the Court will be sensitive to any inequitable conduct of the party seeking its protection. Falstaff's vehement arguments against Miller's position in this case have implied that there is something underhanded or sinister about Miller's persistent attempts to appropriate LITE even after its prior failures. I do not agree. Miller has poured millions of advertising dollars into LITE on the gamble that beer drinkers will come to associate the symbol with its own brand of reduced calorie beer. This is no more suspect than is any attempt by a manufacturer to shape consumer attitudes and desires through the tool of advertising. It was open for any competing beer producer to enter the market, flying the "lite" banner, and foil Miller's attempt. If the evidence ultimately shows that Miller has attained its goal before being so challenged, competition in the reduced calorie beer market will not be doomed by the resulting judgment in its favor. Miller obviously cannot lay claim to "Light" (visually or aurally); that word is, if anything, more solidly generic today than it was when the first light beer case was litigated in 1975–76. The fact that over two dozen other brewers have been able to enter the market without using "lite" counters any suggestion that legal sanctioning of Miller's exclusive use of LITE would have a devastating impact on the beer industry.

Therefore, for the reasons set forth above,[27] a preliminary injunction will issue

---

**26.** Here, even if most consumers might not be misled into picking up Falstaff's can for Miller's, there is the real possibility that the public might believe that Miller has in some way authorized Falstaff to market a local version of Miller's LITE beer. *See Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 268 (S.D.N.Y.1968).

**27.** The complaint also alleges violation of the Rhode Island General Trademark Law, R.I.G.L. § 6–2–12, and the common law of trademarks.

The parties have neither briefed nor argued the relevance of this statute, and I am aware of no Rhode Island decision construing it. Common law trademark principles are, as I have explained, incorporated in some degree into § 43(a). For these reasons, and in view of my disposition of the federal claims, there is no need to pursue the state law questions at this time.

restraining Falstaff from marketing anywhere in the country a reduced calorie beer using the symbol "Lite."

### On Motion For Stay

■ On October 29, 1980, this Court entered a preliminary injunction restraining Falstaff Brewing Corp. ("Falstaff") from marketing a low calorie beer under any label containing the word "Lite". Falstaff has moved for a stay pending appeal, suggesting several reasons why Miller Brewing Co. ("Miller") is unlikely to prevail on appeal. Of these arguments, I conclude that one—that dealing with the state of trademark law in this circuit after the recent decisions in *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1st Cir. 1980) and *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 634 F.2d 1 (1st Cir. 1980)—has merit. After these cases, I find it problematic whether Miller's claim is precluded as a matter of law. Because there is considerable uncertainty on this point, which can be dispelled only with the guidance of the Court of Appeals, the preliminary injunction will be stayed pending appeal.

Having concluded that this course is appropriate because of developments in trademark law in this circuit, I would not strictly have to address Falstaff's other major arguments in favor of a stay. I have chosen to do so, however, because these points will be relevant to the merits of Miller's request for preliminary relief if the Court of Appeals determines that its claims are not precluded by the recent cases. After reviewing Falstaff's arguments, I adhere to my conclusion that Miller has made the requisite showing of irreparable injury, a balance of harms in its favor, furtherance of public interest, and probability of success in proving its factual allegations. It is my uncertainty about whether *Keebler Co.* and *S.S. Kresge* II have undermined the legal bases of my original opinion that causes me to stay the injunction until the Court of Appeals can act.

### I. *Collateral Estoppel*

Falstaff first argues that Miller is collaterally estopped from attempting to prove that LITE is not a generic term in today's beer market. This Court rejected that argument in its original opinion, and I see no reason for changing that view now. *Keebler Co.* establishes that genericness is a question of fact in this circuit. *See* 624 F.2d at 375. It is an elementary principle of the law of collateral estoppel that "an intervening factual change can displace a factual issue on which the initial judgment depended, so that collateral estoppel becomes inapplicable. 1B Moore's *Federal Practice* par. 0.448 at 4232. This Court holds to its conclusion that objective changes in the low calorie beer market between 1975 and 1980 constitute a material change in fact sufficient to overcome the bar of estoppel.

In opposing application of the "change in material fact" doctrine to this case, Falstaff predicts a flood of repetitious litigation instigated by persistent manufacturers wishing to appropriate generic marks. While this situation would obviously be undesirable, the Court does not agree that its decision here would produce such a result. The factual setting of this case is very unusual, if not unique. "LITE" was denominated generic in the context of a new market in which there were few competitors. Unlike a normal trademark case where the parties are fighting over the right to use the identical symbol, no one was using or attempting to use the precise mark Miller employed. Even after the Seventh Circuit decisions in *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75 (1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978), and *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990 (1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980), no major brewery employed the mark "Lite" for several years; in fact, this litigation involves the first such attempt. Thus, in marked contrast to the typical trademark case, a judicial determination that "Lite" was generic did not precipitate simultaneous use of the symbol by the losing party's competitors. With exceptions that Falstaff apparently

admits were "minimal", Miller's use of "LITE" remained exclusive in an expanding market populated by an ever-increasing number of "Light" beer labels.

Contrary to Falstaff's suggestion, this Court did not regard Miller's heavy advertising expenditures as the index of changed circumstances. It was the dramatic (and undisputed)[1] alteration in the low calorie beer market—a factor over which Miller obviously had no control—that led this Court to conclude there had been a change in material fact sufficient to overcome the initial hurdle of collateral estoppel. Certainly, Miller's practice of using "LITE" in a trademark-like fashion in its aggressive ad campaign supported the inference that an alteration in consumer perception probably accompanied the change in market characteristics. *See Colby College v. Colby College—New Hampshire*, 508 F.2d 804, 808 (1st Cir. 1975). This is a far cry, however, from suggesting that a manufacturer could obtain relitigation of the "genericness" of a mark simply by mounting a blitzkrieg of advertising.

In sum, the atypical factual history of the "LITE" mark makes it highly unlikely that allowing Miller to attempt to prove that "LITE" is no longer generic would have the pernicious effects on finality of trademark decisions that Falstaff suggests.

## II. *Probability of Success at Demonstrating Secondary Meaning*

Falstaff next argues that Miller has not shown sufficient likelihood of success at ultimately proving "LITE"'s secondary meaning. Once again, I see nothing to make me change my original assessment of this issue. In this circuit, circumstantial evidence of 1) long and exclusive use of the symbol, 2) size or prominence of the enterprise, and 3) promotional efforts surrounding the symbol may be sufficient to support a finding of secondary meaning. *See Colby College v. Colby College—New Hampshire*, 508 F.2d at 807–10. As reviewed in my earlier opinion, ample evidence of each of these elements is present in this case.

In that opinion, I also noted that direct evidence of secondary meaning in the form of consumer surveys was weak, primarily because of the age of the 1975 data Miller presented.[2] At Falstaff's prodding, Miller has now produced a more recent survey. This 1978 data, while still not as up-to-date as it might be, certainly is a more helpful indicator of current consumer perception. Without my purporting to have undertaken a detailed analysis of the methodology of the 1978 study, it seems to me that the fact that 51% of those polled considered "LITE" to be a brand name supports, at the least, Miller's position that its 1975 survey results are still meaningful.[3]

Thus, my assessment that Miller would probably succeed in proving that a significant quantity of the beer drinking public perceives "LITE" as the mark of a particular producer is, if anything, more firm now than at the time of my original opinion.[4]

---

1. Facts about the history of Miller LITE and the growth and change in the low calorie beer market were detailed in several affidavits submitted by Miller. Falstaff has not produced any evidence contesting their accuracy, and the Court has therefore accepted them as true.

2. Also, I found the format of the 1975 survey somewhat leading (not "*mis*leading", as Falstaff indicates in its brief). This factor, while perhaps diminishing the weight that the results should be accorded, by no means makes the survey incredible.

3. It should be pointed out that even the Seventh Circuit concluded that "LITE" possessed secondary meaning. *See Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 80

n.6 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).

4. Falstaff points to the increasing utilization of "lite" by other manufacturers to denote their low calorie products. Use of "lite" to describe salt, pancake syrup, and salad dressing is of course relevant to whether today's consumers perceive "LITE" as describing the type of product rather than signifying its origin. That some other low calorie products bear the word "lite", however, does not decisively foreclose the possibility that when the beer buying public sees "LITE" on a beer label it thinks of one particular brand of reduced calorie beer. Consumer perception of a mark's meaning may vary with the market context. *Cf. Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 376 (1st Cir. 1980) ("It is possible for a term to be generic in one

### III. Balance of Harms

Falstaff also argues that the balance of harm weighs in its favor. It alleges, for the first time, that it will suffer in future dealings with its distributors if it must renege on delivery commitments for its new low calorie beer product. This shelf space problem certainly adds a new dimension to the Court's assessment of the relative hardships implicated by a decision on preliminary relief; it does not, however, change my ultimate conclusion. As I made clear in my first opinion, nothing prevents Falstaff from immediately marketing its low calorie beer under any label other than one using "Lite". It has recently obtained government approval for an "Ultra Light" label, bringing to four the number of "Light" labels Falstaff is certified to use. *See* Opinion of October 29, 1980, p. 912 n.22, *ante.* Presumably, bottling the beer under one of these alternative labels would alleviate the shelf space commitment problem; at the same time, it would mitigate Falstaff's losses from spoilage of existing but unbottled beer.

■ Contrary to Falstaff's bald assertion, Miller *would* suffer grave harm if preliminary relief is denied. As discussed in my prior opinion, once a manufacturer has established probability of success in proving secondary meaning, the conclusion that irreparable injury will result if a competitor is permitted to begin using the mark is virtually automatic.[5] Unless the status quo is preserved pending trial, the very harm the plaintiff seeks to avoid—*i. e.*, a competitor's poaching on public association of the mark with the plaintiff's product—will inevitably occur.[6] In response, Falstaff argues that, under *Keebler Co.*, Miller will have to prove actual consumer confusion, and that Falstaff should therefore be allowed to use "Lite" so we can observe whether such confusion really occurs. Without doubt, the First Circuit did require Keebler to prove actual customer confusion. *See* 624 F.2d at 377–78. However, Falstaff fails to note the critical distinction drawn by the Court of Appeals in that case: such proof is required only when the symbol is in simultaneous use by multiple manufacturers *at the time the litigation takes place.* The Court was careful to reassert that in a case seeking injunctive relief from a competitor's *anticipated* use of the symbol, "[p]laintiff should not be expected to stand by and await the dismal proof" of actual confusion. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d at 377, *quoting DeCosta v. CBS, Inc.*, 520 F.2d 499, 514 (1st Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). Thus, Falstaff's sugges-

---

market but not in another"—different geographical markets). It is not unreasonable to assume that the beer market is distinct from the market for grocery items such as pancake syrup and salad dressing. Certainly, beer advertising is significantly different in style, tone, timing, and intended audience. For example, it is difficult to picture ads for salad dressing interspersed throughout the Sunday afternoon football programming, or to imagine prominent sports figures extolling the virtues of low calorie salt.

For the same reasons, granting Miller the exclusive right to use "LITE" to market reduced calorie beer would not necessarily interfere with use of "lite" by manufacturers of other types of products. *See DeCosta v. Columbia Broadcasting Corp.*, 520 F.2d 499, 513 & n.27 (1st Cir. 1975) *and* treatise discussed therein. As for Falstaff's use of Chaucer to support its contention that "lite" is a venerable and accepted variant of "light", I would simply suggest the perils of seeking a standard for Modern English spelling and usage in works written in Middle English, which differed significantly in alphabet, spelling, vocabulary, and pronunciation.

5. Different considerations may apply in a case where both parties have been using the mark prior to the institution of suit. In such circumstances, the mark is already being "diluted" by virtue of simultaneous use by competitors; the defendant's continued use of the mark pending trial would not, therefore, inevitably produce irreparable harm.

6. Moreover, because poaching on the plaintiff's preserve of good will means preying on the confusion and uncertainty of consumers, an order that prevents use of the symbol by the defendant pending full examination of its role as a brand discriminator serves the public interest.

Of course, as suggested in the previous footnote, different considerations may govern the case where concurrent use of the mark by competitors predated the onset of litigation.

tion that permitting its interim use of "Lite" would, on the whole, be beneficial must be rejected.

## IV. *The Impact of Recent Caselaw*

Finally, Falstaff contends that two recent decisions by the First Circuit render Miller's claim legally untenable. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, which was decided four and one-half months before this Court's original opinion, somehow escaped the attention of both the parties and the Court. *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 634 F.2d 1 (hereinafter "*S.S. Kresge* II") came down two days after the preliminary injunction issued in this case. Although I do so somewhat reluctantly, I must agree with Falstaff that there is language in these cases which creates doubt about the viability of Miller's claim sufficient to warrant a stay of my original order.

In that original opinion, this Court proceeded on two legal premises. First, I rejected Miller's argument that the use, *per se*, of a generic mark could give rise to an unfair competition claim under § 43(a) of the Lanham Act. My reasoning was essentially this: both genericness and secondary meaning hinge on public understanding of the symbol's significance. If a mark designates the *type* of product, such that it is deemed "generic" for trademark purposes, then obviously it cannot serve the brand discriminating function which forms the basis of a § 43(a) claim. In the course of this analysis, I expressed considerable doubt that words or symbols have an intrinsic legal classification which can be divined without reference to consumer perceptions in the market context. Second, I concluded that the legal status of a symbol could change over time so that, if there have been material changes in relevant market conditions, a manufacturer might be able to show that a once-generic mark has become a protectable brand discriminator. In essence, I held that just as consumer perceptions are not static, so the legal classification of symbols is not immutable. Under this view, a mark's status for trademark and/or § 43(a) protection would present distinct legal questions at different points in time, somewhat like a taxpayer's legal status as "charitable" or "qualified" varies according to its current factual situation. *See* 1b Moore's *Federal Practice* par. 0.422[4] at 3412–13.

There is language in *Keebler Co.* that affirms the correctness of my first premise. After determining that the evidence of consumer understanding of the mark "export soda" amply supported the District Court's conclusion that the term was an unregisterable generic word, the Court of Appeals proceeded to discuss the impact of this finding on Keebler's § 43(a) claim:

> Although the district court did not explicitly address the elements of common law trademark infringement or false designation of origin, the court's finding that the term "export sodas" is used and understood by Puerto Rican merchants and consumers to mean a particular type of cracker and not a particular producer *forecloses any possibility* of Keebler establishing a right to exclusive use in Puerto Rico on the basis of secondary meaning.

624 F.2d at 376 (emphasis added; footnote omitted).

This passage seems to indicate that the touchstone of genericness for trademark purposes is the same as that of protectability under § 43(a): public understanding of the symbol as designating origin rather than type of product. *See S.S. Kresge* II, at 2 (a "generic term" "used generically" cannot support a § 43(a) claim to exclusive use).

On the other hand, earlier in the *Keebler Co.* opinion, the Court states:

> No amount of purported proof that a generic term has acquired secondary meaning associating it with a particular producer can transform the term into a registerable trademark. Similarly, at common law terms that are generic are normally not subject to appropriation as trademarks, although a strong showing of secondary meaning may be sufficient to grant a right to exclusive use.

624 F.2d at 374–75 (citations omitted). This paragraph, which was quoted with added emphasis in *S.S. Kresge* II, *see* at 916, appears to be the principal source of perplexity in the instant case. It therefore merits careful attention and fine dissection. To the extent that the last clause implies that a generic mark may nevertheless have sufficient secondary meaning to merit exclusive use protection via § 43(a), my rejection of Miller's argument would seem erroneous. Whatever Miller gains on this point, is, however, lost on another, for the first sentence of the passage seems squarely in opposition to my second premise that a mark may shed its generic label if the factual circumstances of the relevant market undergo significant change.

Of course, one need not necessarily read the first sentence of the passage as foreclosing Miller's claim. For example, Miller suggests that the Court of Appeals was speaking *only* of registerability under the federal statute. It points to the last clause of the quoted portion as indicating that a finding of genericness at one point in time does not invariably preclude protectability, under a non-trademark theory, at some other time. Admittedly, this reading would not be inconsistent with the result in *Keebler Co.*, for the question of § 43(a) protection in that case was litigated *contemporaneously* with the issue of registerability. Nor would it conflict with the outcome in *S.S. Kresge* II, where the plaintiff attempted unsuccessfully to avoid the consequences of a recent finding of genericness by proving that the term *concurrently* possessed secondary meaning in a limited geographical area. The difficulty with this interpretation, however, is that it doesn't have much support in policy. As my original opinion discusses at length, the goals of federal trademark law and § 43(a) are identical: safeguarding the consumer's ability to use product names and symbols to differentiate one manufacturer's product from those of his competitors. It is not apparent to me why, if a mark has attained sufficient public recognition as a brand discriminator to justify exclusive use protection under § 43(a), it should not equally merit registration. Of course, the answer may lie in some technical difficulty with the registration statute, which might be read to mandate a perpetual ban on registration once a symbol has been branded generic. However, since the Court of Appeals did not advert to any such reason as the basis for its statements, I am hesitant to supply it myself.

Another interpretation of the quoted language would suggest that the first sentence is nothing more than a restatement of something fairly obvious: having found that a mark is generic (*i. e.,* indicates product, not producer), a court will not make a separate examination of any *purported* proof of secondary meaning, for the former finding conclusively establishes the absence of the latter. This interpretation divests the words "has acquired" of any temporal connotation. Reading the first sentence as merely establishing that secondary meaning cannot be found *contemporaneously* with genericness leaves open the possibility that the status of a mark can change over time. In the first *S.S. Kresge* opinion, 598 F.2d 694 (1st Cir. 1979), the Court of Appeals clearly indicated that it was possible for a generic word to evolve over the course of time and usage into a protectable mark, at least in the absence of a prior judicial determination of genericness. *See* 598 F.2d at 696. Similarly, in *Keebler Co.* the Court not only reviewed evidence that "export soda" was generic *before* Keebler entered the market, but also carefully noted the evidence that "the term *remained* generic in the Puerto Rican market." 624 F.2d at 375 (emphasis added).[7] Several things militate against adopting this interpretation,

---

7. Later in the *Keebler Co.* opinion, the Court referred to "the generally prevailing view that a mark once generic . . . cannot become registerable even though one party has enjoyed a period of exclusive use of the mark." 624 F.2d at 375–76. The Court did not indicate, however, that it was expressly adopting the general view as the law in this circuit. Indeed, there would have been no reason to discuss evidence regarding the state of the market subsequent to Keebler's entry if the Court believed that, as a matter of law, Keebler was forever foreclosed from claiming an exclusive right in "export soda" if the mark had once been generic.

however. In the first place, the words "has acquired" do, in their most common usage, imply the passage of time. Moreover, this interpretation makes it even more difficult to explain the meaning of the last clause of the quoted passage. Finally, in a short and rather cryptic paragraph which follows a quotation of the *Keebler Co.* language,[8] the Court in *S.S. Kresge* II seems to have limited the implications of *Keebler Co.* and warned, in effect, that it is easier for a camel to pass through the eye of a needle than for the user of a "generic" mark to obtain exclusive use protection.

In sum, *Keebler Co.* and *S.S. Kresge* II may raise as many questions as they answer. I think it by no means certain that these cases preclude Miller's claims as a matter of law.[9] Both are readily distinguishable on their facts, for both involve the ability of a mark *currently* regarded as generic by the substantial portion of consumers to attain exclusive use protection. Neither holds squarely that once a mark has been declared generic, a manufacturer is forever barred from attempting to prove that, because of significant changes in market characteristics, the mark now serves a brand discriminating function meriting protection. Nevertheless, there is language in both cases whose import is unclear and whose effect may well be to foreclose Miller's claims. I an exceedingly troubled by granting a stay here. For the reasons set out in the prior opinion and in the first parts of the present one, I believe Miller has shown a considerable likelihood of being able to prove that the beer-drinking public regards "LITE" as a designation of origin *if* it is permitted to do so. I am therefore reluctant to permit the status quo to be altered by Falstaff's introduction of a "Lite" beer, especially when its own actions in procuring approval for "Light" labels demonstrate that the use of "Lite" is not strictly necessary to its marketing of a low calorie beer.[10] Nevertheless, because I am unable clearly to discern the state of the

8. That paragraph reads:

> *Keebler* itself focused on a term whose generic traits had evolved in connection with its use as a label for a particular product. Moreover, in most of the cited cases involving the use of generic terms, the term was used in conjunction with one or more individualized or descriptive words. Here, appellants seek protection for the generic word alone.

At 916 (citation omitted).

9. Falstaff places great reliance on the last paragraph of *S.S. Kresge* II, arguing that the language there mandates a conclusion that Miller's claim is precluded as a matter of law:

> We rule that when a generic term is used generically without any other descriptive or identifying words, it cannot acquire either common law trade name protection or exclusive use protection through secondary meaning.

At 917 (footnote omitted).

In my view, this sentence, which summarizes the Court's holding rather than states a method of analysis, is not all that helpful here. It does not purport to tell us when a term is "used generically". Nor does it address the critical question whether genericness is an immutable status. Miller's position, of course, is that "LITE" is not now a "generic term" and that it has never been "used generically". The facts of *S.S. Kresge* II do not shed much light on how the above-quoted passage is to be applied to this case, for in *Kresge* there was no apprecia-

ble time lapse, nor any significant change in circumstances, between the Court's conclusion that "mart" was generic and Kresge's attempt to obtain § 43(a) protection through proof of secondary meaning in a small segment of the market.

It seems to me that, at most, this passage conclusively establishes that if "LITE" is in fact generic today (whether because its status cannot be relitigated or because Miller is unable to adduce factual support for its allegation that the public regards the mark as a symbol of origin), then a § 43(a) claim is precluded as a matter of law.

10. As noted in the prior opinion, *see* p. 917 n.2, *ante*, two of the "Light" labels Falstaff submitted for government approval were for "no-name" or "generic brand" beer cans—*i. e.*, containers that merely identify the type of product with no designation of manufacturer. Since these labels do not contain Falstaff's house name, I do not consider them inconsistent with Falstaff's statement at the preliminary injunction hearing that it could not market a low calorie beer under a "Light" label because it currently uses "Light" to designate its light-in-color beer. However, Falstaff has also sought and received approval for two "Light" labels— Falstaff "Light" and Falstaff "Ultra Light"— that include the house name on the front of the label. *See* Appendix C to Opinion of October 29, 1980 *and* Exhibit appended to Miller's "Request to Add to the File" of December 12, 1980. Since Falstaff presumably does not apply for

law after *Keebler Co.* and *S.S. Kresge* II, I cannot confidently conclude that Miller's claim is legally tenable. Believing that such uncertainty warrants the suspension of preliminary relief until the Court of Appeals can consider the questions raised here, I hereby order that the injunction issued by this Court on October 29, 1980, be stayed pending disposition of the appeal.

---

government certification of labels it considers unusable, I regard the existence of these two labels as belying any claim that "Lite" is crucial to Falstaff's entry into the low calorie beer market.

## APPENDIX A

NO. 8-21

12 FL. OZ.

Lite Beer is a fine Pilsner beer which is brewed with the most costly ingredients. Because of a special brewing process, each 12 ounce can of Lite, based on an average analysis contains:

Calories ——— 96
Carbohydrates — 2.8 grams
Protein ——— 0.9 grams•
Fat ——— 0.0 grams•

Lite contains one third fewer calories than our regular beer. Lite is non dietetic. It is less filling, yet has the refreshing flavor found in our regular beers
•Same as our regular beer.

MILLER BREWING CO.
MILWAUKEE, WIS.
AZUSA, CAL.
FORT WORTH, TEX.
FULTON, N.Y.

12 FL. OZ.

APPENDIX B

APPENDIX C